**In the Matter of G.A.C. CORPORATION Bankrupt.**

**Bankruptcy No. 76–131–BK–NCR–B.**

United States District Court,
S. D. Florida.

June 1, 1981.

Frank J. Callahan, Coral Gables, Fla., Herbert S. Freehling, trustee, Fort Lauderdale, Fla., Blackwell, Walker, Gray, Powers, Flick & Hoehl, John R. Camp, Jr., James Yacos, Miami, Fla., Irell & Manella, Milton B. Hyman, Los Angeles, Cal., Britton, Cohen, Kaufman, Benson & Schantz, Miami, Fla., Molloy, Jones, Donahue, Trachta, Childers & Mallamo, John F. Molloy, Tucson, Ariz., Baldwin & Haspel, Michael F. Little, New Orleans, La., for trustees.

Mortimer Shapiro, New York City, Layne & Brill, Herbert L. Brill, Miami, Fla., for Protective Committee.

Robinson & Wolas, Herbert Wolas, Los Angeles, Cal., Martin Sandler, Miami, Fla., Richard H. Millen, Los Angeles, Cal., for GAC Prop. Credit Commission.

Greenberg, Traurig, Hoffman, Lipoff & Quentel, P.A., Miami, Fla., for GAC Corp. Committee.

Carlton, Fields, Ward, Emmanuel, Smith & Cutler, Tampa, Fla., for Polk, Collier and Osceola Counties.

Irving Wolff, Miami, Fla., for Bianco, Halfond and Travelers.

Welbaum, Zook, Jones & Williams, Miami, Fla., for Travelers.

Lovitt & Hannan, San Francisco, Cal., Murray B. Weil, Jr., Miami Beach, Fla., for class action lot purchasers.

Bradford, Williams, McKay, Kimbrell & Hamann, Carl K. Hoffmann, Miami, Fla., for indenture trustee.

Gunn, Venney & Buhler, Miami, Fla., Orrick, Herrington, Rowley & Sutcliffe, Sidney Roberts, San Francisco, Cal., for Bank of America.

Smathers & Thompson, Miami, Fla., Weil, Gotshal & Manges, New York City, for Oppenheimer & Co.

Steel, Hector & Davis, Jerry B. Crockett, Miami, Fla., Cravath, Swaine & Moore, William Struyk, Allen H. Merril, New York City, for Chemical Bank.

Nemser & Nemser, New York City, for Protective Comm. Credit Debentures.

Shearman & Sterling, Peter T. DeKoszmovšzky, New York City, for Citibank N.A.

## MEMORANDUM DECISION, FEE APPLICATIONS

THOMAS C. BRITTON, Bankruptcy Judge.

Thirty-five applicants seek almost $10 million in fees and $312,349 in expenses in these consolidated Chapter X cases. The applications were heard on October 28, 29 and December 9 and 10, 1980. A report and recommendation by the S.E.C., which had been requested by this court, was received on February 6, 1981. Response to those recommendations was heard on February 23.

The S.E.C. has recommended payment of $7.8 million in fees, of which $3.4 million has already been paid as interim allowances. The S.E.C. has also recommended payment of all requested expenses except in two cases.

The care with which the S.E.C. report has been prepared is obvious and greatly appreciated. I am aware of no significant misstatements of the facts and only minor misstatements of the applicable legal principles. In many instances, I have followed the S.E.C. recommendations. However, in other instances, I have found the S.E.C. to be overly generous with the reorganized company's funds. The reasonable compensation fixed by this order for these 35 applicants totals $5,702,103 or $2,595,932 more than they have already received on account, together with additional expenses of $205,287.90.

As may be required by Bankruptcy Rule 921(a) and in order to minimize the delay and uncertainty that results from appeals by several persons from an order that affects others, separate final and appealable orders will be entered on the several applications discussed in this memorandum. Such orders obviate appeals of the memorandum.

The fee applications were questioned by the reorganized company which must bear this expense and by several minor bondholders represented by another attorney. The court's trustees, the indenture trustees for the bondholders and the creditors' committees, who nominally protect the interests of the creditors but who are now the major fee applicants, have only superficially questioned and have not opposed a single fee or expense application.

The almost complete unanimity of counsel does not, of course, relieve the court of its duty to protect the creditors. 3A *Collier on Bankruptcy*, (14th Ed.) ¶ 62.05[3] and v. 6A ¶ 13.02 n.18. Nor does it help the court with what Judge Jerome Frank properly called "the most unpleasant task a judge has".

These fee applications are completely governed by Bankruptcy Rule 10–215, which in 1975 superseded the various statutory provisions from which it was derived. 28 U.S.C. § 2075; *Matter of First Colonial Corp. of America*, 5 Cir. 1977, 544 F.2d 1291, 1297. In determining bankruptcy fees in this circuit, at least, we are bound to apply the guidelines and principles most recently restated in *Matter of First Colonial Corp. of America*, Ibid. p. 1298. These standards are generally applicable to all bankruptcy cases and many have generally been long recognized in all federal courts. 6A *Collier on Bankruptcy*, (14th Ed.) ¶ 13.01 et seq.

■ The Bankruptcy Reform Act of 1978 includes a significant change in the standards governing fees in bankruptcy. Counsel in this case including the trustees' attorneys have argued, in connection with earlier interim fee applications, that the more generous standards of the Reform Act are applicable here and that *First Colonial* is no longer authoritative. The S.E.C. has not squarely addressed this issue. It is apparent that this view influenced many of the pending applications. It should be clear, however, that the Reform Act has no application in this case and that *First Colonial* remains controlling as to this case.

Congress could readily have made the Reform Act applicable to all pending cases including this one. It not only declined to do so, it unambiguously directed that all decisions in all pending cases, which includes this one, be completely unaffected by the new legislation:

"A case commenced under the Bankruptcy Act, and all matters and proceedings in or relating to any such case, shall be conducted and determined under such Act as if this Act had not been enacted, and the substantive rights of parties in connection with any such bankruptcy case, matter, or proceeding shall continue to be governed by the law applicable to such case, matter, or proceeding as if the Act had not been enacted." Pub.L. 95–598, § 403(a).

*First Colonial* directs that "economy is the most important principle to be considered in awarding fees":

"This does not mean that the bankruptcy judge should be parsimonious—that would be a false economy which would discourage competent counsel from offering their services to trustees in bankruptcy—but rather that he should award an amount which is 'at the lower end of the spectrum of reasonableness.' ... [O]fficers of the court...should not expect to be compensated as generously for their services as they might be were they privately employed." Ibid., p. 1299.

■ In almost every instance, the fees sought in this case clearly exceed the *First Colonial* guidelines. Almost every attorney in this case seeks a sum substantially greater than his customary billing rate to his private clients. Almost no attorney in this case has fixed his customary billing rate at less than $100 an hour for all service rendered in this case, even such mundane tasks as reviewing the pleadings and correspondence of other parties, attendance in court as observers, travel and preparing of fee applications.

This court has experienced no shortage of competent counsel during the five years this case has been pending. Few attorneys have received compensation in this court at and above $100 an hour during that period

and then only for recent services[1] or for extraordinary accomplishments, in litigation. Because of the trustee's reluctance to litigate, this case has been unusually free of litigation and I am aware of no attorney's accomplishment in this case that could really be termed extraordinary.

Bankruptcy Rule 10–215(a) requires that each applicant set forth "a detailed statement of (1) the services rendered". *Matter of First Colonial* underscores this duty:

> "To this end, each attorney seeking compensation should be required to file a statement which recites the number of hours worked and contains a description of how each of those hours was spent." Ibid., p. 1299.

Very few of the applicants in this case complied with these essential requirements. Indeed, several applicants merely estimated the time they spent, a practice the court held to be "insufficient to support the award of fees" in *First Colonial*. Ibid. p. 1300. It is the applicant's burden to justify his application. Where the applications have been insufficient, I have resolved against the applicant all reasonable doubt as to the nature, extent and necessity for the services which the applicant claims to have performed.

*First Colonial* stresses the special need in bankruptcy to guard against duplication of services. Ibid, p. 1299. Beginning with the appointment of two trustees, the duplication of services in this case permeates almost every application. To note one almost ludicrous example, the G.A.C. Properties Credit Creditors' Committee chairman, a Los Angeles attorney, seeks over $250,000 for his legal services. His Committee also employed two other Los Angeles attorneys and a Miami attorney. These three additional attorneys ask for an additional $950,-000.

This committee represented bondholders, who were also represented by another committee, Protective Committee for Credit Debentures, which had three lawyers. These same bondholders were also represented by three corporate indenture trustees, each of which had two law firms plus a trust officer employed in this case. The total bill for this phalanx, protecting exactly the same interest, is $3,575,000.

■ The court was powerless to prevent this duplication, but that is no reason to make the debtors' creditors, who are now the stockholders of the reorganized debtor, bear the expense of unreasonable duplication. As the S.E.C. has noted, "the estate is to be charged only one fee for particular services, regardless of the number of persons involved in performing that service." *Finn v. Childs Co.*, 2 Cir. 1950, 181 F.2d 431, 436.

The S.E.C. gave no consideration to time spent in travel or in preparing fee applications. *Rose Pass Mines, Inc.*, 5 Cir. 1980, 615 F.2d 1088, 1093, followed in *Matter of Braswell Motor Freight Lines, Inc.*, 5 Cir. 1980, 630 F.2d 348, 351 is unequivocal in requiring compensation for this necessary service, but for moderate time and at a reduced hourly rate:

> " . . . we do not see how such a task could consume more than ten or twelve work hours or merit compensation at the rate of $100 per hour."

By the same token, travel time must also be considered where resort to out of town counsel is reasonable. The compensation in such instances, however, should not be at counsel's maximum hourly rate except for time he actually spent performing legal services while travelling.

These 47 Chapter X cases, which were filed in late 1975 and early 1976, involve wholly owned subsidiaries of G.A.C., a land development company with projects in Florida and Arizona. The company foundered under inept management, under the stress of the nationwide collapse of the real estate market in 1975, and under the pressure of environmentalists and regulatory agencies which suspended operations in several projects.

---

1. Inflation has significantly affected legal fees. However, only the rates prevailing when the services were rendered are pertinent here. *Pa-cific Coast Agricultural Export Association v. Sunkist Grocers, Inc.*, 9 Cir. 1975, 526 F.2d 1196, 1210 n.19 (antitrust case).

Callahan, one of the two trustees, and his attorneys got the company back in business by abandoning hopeless projects and forcing purchasers to accept substituted sites in projects that could be completed. These measures permitted changes in the company's development plans to meet the demands of environmental regulatory agencies and the Federal Trade Commission. The general recovery of the real estate market together with the settlement of the company's major lawsuits completed the restoration of the income stream which made the formulation of a reorganization plan possible. The trustee's plan was accepted by the affected creditors and was confirmed in 1980.

Almost every applicant views the reorganization as a near miracle for which his contribution was essential. I cannot agree. Reorganization in this case would have been impossible without a prompt recovery of the real estate market. No applicant can claim credit for that. The remaining obstacles in the path of reorganization were largely overcome by the trustee Callahan and his attorneys. Most of these obstacles, were created by the other applicants pressing for what they believed to be their personal interest. Few of the other applicants meaningfully contributed to the elimination of these obstacles or the reorganization of these debtors.

Reorganization in this instance was at best a mitigation of damage for most creditors. Some 40,000 lot purchasers had an opportunity to get essentially what they had bought, but almost all suffered years of delay. Many hundreds fell by the wayside, because they failed to get notice or failed to exercise their options despite this court's best efforts.

The bondholders have received a fraction of their claims and stock in the reorganized company. These creditors may well ultimately recover the full amount of their claims, but most have already been delayed six years during a period of general infla-

tion. The stockholders will get nothing and have lost their stock.

The reorganization in this case has been, in my view, a very modest success. In any event, I quite agree with the S.E.C. that the so-called "lodestar" approach [2] is inappropriate here and that:

> "The fact that counsel has successfully performed the work he was employed for should be a source of gratification but not of amazement."

These cases were assigned initially to my colleague Judge Hyman, who passed away on October 1, 1979, after a prolonged illness. Except for occasional earlier hearings during Judge Hyman's absence, my responsibility for the cases did not begin until the Spring of 1979. In considering these applications, therefore, I have reviewed the pleadings and transcripts of all proceedings in these cases and the adversary proceedings related to these cases which occurred before my involvement. Because this record is voluminous (it presently occupies 40 file drawers), the entry of this order has been delayed.

I have considered each of 12 factors specified in *Matter of First Colonial*, supra, p. 1298 in determining each of the applications before me. Except as noted in this opinion, I concur in the S.E.C.'s consideration of each of these factors with respect to each applicant.

Except to the extent that acceptance of any employment reduced the time available for other employment, there is no evidence that any applicant was precluded from other employment.

No applicant's fee was contingent in this case. There were ample assets at all times to pay as administrative expenses all reasonable fees incurred to date.

The time limitations imposed by employment in this case were significant in virtually every instance. The involvement of many other parties and the court's active supervision typically required every partici-

---

2. The lodestar approach has been employed in some class action suits. It compensates for the contingent nature of compensation in such cases by using multiples of normal billing rates in successful cases, at least for particularly productive efforts.

pant's attention to each matter without appreciable delay.

The experience, reputation and ability of the attorneys in this case, without exception, was at least commensurate with the responsibility each undertook.

This case was not undesirable in any sense relevant to these applications.

In most instances there had been no previous professional relationship with the client. Where there had been a relationship, as in the case of some counsel for the indenture trustees, that factor was not significant in these applications.

Awards in similar cases have not been useful except in a very general sense, because reorganization cases do not fit a common mold. Awards made in other courts could have been affected by many factors not available for comparison here.

The foregoing comments of a general nature are applicable to all applications unless noted otherwise in the following specific comments relating to the several applications.

*The Co-Trustees.* One trustee-receiver, Callahan, served as the chief executive officer of these debtors for four years and 10 months, from December, 1975 to October, 1980. This was a full time occupation. He is a 60 year old, semi-retired Florida businessman, never previously involved in the real estate or construction field who previously owned and ran his own successful business. He has had no previous salaried executive employment which would indicate the value of his services. He asks $300,000 a year. The S.E.C. recommends almost $285,000 ($1,375,000 divided by 4.83 years).

Corporate executive compensation, like the compensation of entertainers and professional athletes afford little, if any, meaningful basis of comparison. An individual who has achieved outstanding success acquires a certain star quality which commands for a while almost astronomical compensation, which is economically justified by his demonstrated success. Much of an executive's compensation is contingent or deferred and, therefore, difficult to equate

in salary. Additionally, in the corporate arena, chief executives frequently, if not typically, control directly or indirectly enough of the directors so that they can dictate their compensation.

Without denigrating either his ability or his efforts, it is unrealistic to presume that Mr. Callahan could have commanded employment as a chief executive in this business field in this area for $285,000 during the years in question.

The test for compensation framed by *First Colonial* is the lowest sum which will not discourage competent candidates from offering their services. At the time Mr. Callahan was appointed and throughout his tenure this court had a list of over 100 retired or semi-retired businessmen who had offered their services and had been investigated and approved by this court. This area is unusually rich in this resource. At least a quarter of this group equaled Mr. Callahan's qualifications. Compensation of $100,000 would not have discouraged any of these applicants or anyone else whose time was not already committed. Compensation of $150,000 would have amply rewarded his continued efforts.

Callahan's responsibility in this instance was divided with a co-trustee. Though this must be a factor, in this case I consider it a minor one.

Finally, and more importantly, Callahan displayed an appalling lack of sensitivity to his fiduciary role. In 1976, he purchased a new Mercedes in his name with the debtor's funds with the undocumented intention of reimbursing the company. After the transaction came to light and was questioned, he reimbursed the debtors. Judge Hyman lectured him. Subsequently, without court authorization and without seeking guidance from his counsel, he directed that the company provide him with a new automobile each year for his personal use. It is hard to have complete confidence in one with such a loose sense of his fiduciary responsibility.

Balancing the foregoing factors with Mr. Callahan's willingness to devote his full energy to this assignment, its difficulty and

his successful perseverance, I find his reasonable compensation to be $130,000 per year. This is a total of $628,000 or $118,000 more than he has already received in interim allowances.

Freehling served as co-trustee and receiver for four years and one month. At the outset, there was the possibility of conflicting interests among the debtors. He is a 68 year old, retired successful businessman-attorney who had served 16 years as bankruptcy trustee in the Ft. Lauderdale area. He continued to handle some 30 other trusteeships with this case, but devoted a major part of his time to this case. His role was distinctly secondary to that of Callahan, principally overseeing the operation of the debtors' resort hotels, a consistent source of losses. He has already received $83,000 per year for his services and I agree with the S.E.C. recommendation that he receive no more.

*Trustees' General Counsel.* The trustees were represented by Blackwell, Walker, Gray, Powers, Flick & Hoehl, a large, local, general service firm, without substantial previous bankruptcy experience, and by James Yacos, initially with another firm and later a sole practitioner, who had been a local bankruptcy judge for many years. Both served for four years and 10 months. Yacos provided the bankruptcy expertise. Blackwell, Walker provided the manpower and the expertise to handle most litigation, including objections to claims, as well as almost all legal services of a general nature required by the trustees and the debtors. The debtors also had a salaried general counsel, but he was concerned only with corporate formalities. The trustees additionally retained a number of special counsel.

The applications of both counsel are detailed and complete. Blackwell, Walker performed its assignments well and with dispatch. There were instances, of course, where there was some duplication of services, not only between the two attorneys, but with special counsel and even within Blackwell, Walker. I do not consider that duplication unreasonable or excessive in this instance.

The S.E.C. has recommended total compensation to Blackwell, Walker of $2,450,000 or an average hourly rate of almost $80 an hour for 30,630 hours. This sum represents almost the full amount of its normal billing rates. I accept the S.E.C. recommendation as to Blackwell, Walker.

Since the foregoing application and after the S.E.C. report, Blackwell, Walker has applied for $112,188 for 1,231 additional hours, including $34,812 for preparing its fee application. I find the time and expense for "preparing and supporting these fee applications" to be excessive. I fix $20,000 to be a reasonable allowance for that purpose. Interim applications each quarter already provided the necessary data. An additional $75,000 is authorized for Blackwell, Walker's other services since the application reviewed by the S.E.C.

Yacos seeks $210 per hour for 6,898 hours. The S.E.C. has recommended compensation for him at an average rate of almost $145 an hour. This sum is excessive. Yacos, who had practiced but a few months when he received this appointment, had no really established normal billing rate. His services in this area, at that time, had a normal value of not more than $100 an hour. Inflation warranted an increase over the years, but the fact that he became a sole practitioner did not warrant special consideration. That was his choice and it required that his time be devoted to every task, however simple and routine. This circumstance reduced the value of his time for most of the services he performed.

These cases occupied most, but by no means all of Yacos' time. He handled many other bankruptcy matters during this period.

I agree with Yacos that he must bear the primary responsibility for the trustees' embarrassing (and ultimately time-consuming and therefore costly) failure to seek court approval for widespread payments to themselves, favored employees, and almost all counsel associated with the cases. The details are summarized in this court's order of August 13, 1980 (C.P. No. 2878) and need

not be repeated. It is incredible to me that Yacos could have failed to instruct the trustees as well as the debtors' comptrollers and independent auditors to prevent these unauthorized expenditures and it is inexplicable that he ignored the obvious disregard of Bankruptcy Rule 10–215(a). He gave his clients no instructions as to their fiduciary duty. He recommended no safeguards. His excuse that he was heavily involved in attending Callahan is not enough. A trustee's attorney owes a greater responsibility than merely doing his client's bidding.

In all other respects, he performed his services accurately and well.

Reasonable and adequate compensation for Yacos' services is $650,000 or $192,075 more than he has already received. To facilitate accounting with his former firm, Yacos has requested division of his fee. For that purpose, I accept the ratio recommended by the S.E.C.

*Special Counsel.* The trustees engaged four special counsel. I accept the S.E.C. recommendation with respect to Britton, Cohen, etc., (Remuda foreclosure) $32,050, Molloy, Jones, Donahue, etc., (Arizona land problems) $2,355, and Baldwin & Haspel (Brand names) $5,328.

Irell & Manella (tax matters) has requested almost $160 an hour for 2,039 hours. The S.E.C. has recommended a total of $250,000, or an average of about $123 an hour. It is excessive. Milt Hyman of this Los Angeles firm was employed on February 20, 1979 to advise on tax matters presented by and affecting the trustees' plan of reorganization. Without seeking further authorization he performed substantial other services at Callahan's request. Those services were not authorized, were not necessary and are not now authorized by this court.

Because Judge Hyman authorized his employment, I do not now question the reasonable necessity for importing tax counsel at such a distance. Hyman is well-qualified in his field and performed his tax services well. I agree with the recommendation of counsel for the reorganized company, that $200,000 or $89,112 more than he has already received is ample compensation for Hyman and his firm.

*Indenture Trustees.* As has already been noted, the three indenture trustees, Citibank, Bank of America and Chemical Bank, and their counsel form a part of a particularly egregious duplication in this case. The three institutions had a contractual duty to protect the interests of debenture holders. This required that each monitor and participate in the proceedings. Each had essentially the same assignment for counsel, but their requested compensation varies from $343,147 to $559,341. The S.E.C. recommends $215,000 each for two banks and $325,000 for the third. I cannot. To begin with, I find no reason why the reasonable value for legal services required of these three trustees should differ.

In each instance, considerable time was spent, both by regular counsel and local counsel, in monitoring the proceedings and in communicating with each other and with counsel for the other indenture trustees. This was an unnecessary duplication and the regular counsel, based in New York and California could have either reposed more confidence in the completely qualified local counsel each selected or dispensed with the additional expense altogether.

I agree with counsel for the reorganized company that reasonable compensation for the legal services for each trustee is $150,000. I accept the S.E.C. recommendations as to compensation for each indenture trustee's house staff in view of the S.E.C.'s special expertise in this area, however, I remain mystified by the large discrepancy in this expense.

On the motion of these indenture trustees, enough was withheld from distributions to the bondholders to cover their entire applications. I find that the foregoing reasonable compensation for these trustees and their counsel which is provided from this estate fully and adequately compensates each trustee for its entire unrecovered expenses related to these bond issues. Since there is no inability on the part of this estate to pay those expenses, there is no

need or justification to withhold any part of the distribution payable to any indenture holder. The sums withheld should be disbursed forthwith to the bondholders at the indenture trustees' expense.

*Creditor Committees.* There were three creditors' committees in this case. Each was constituted in accordance with the Act. However, there was no general participation by creditors in the formation of any committee and the selection of the committee members in each instance was engineered by a small clique. The committees' principal and perhaps only accomplishment was the employment of counsel. The committees neither directed nor supervised counsel; in any meaningful way.

The seven attorneys (two from New York, two from Los Angeles, and three from Miami) and the three committees seek nearly $3 million for their services. The S.E.C. recommends $1.25 million.

Had this array busied themselves elsewhere, Callahan and his counsel could have concentrated their efforts on rehabilitating the debtors instead of fighting off constant efforts to liquidate the assets. A plan could have been proposed in half the time and at half the expense involved here. That plan would probably have provided less cash and less liquidation of the debtors' real property in exchange for greater equity in a stronger company. In today's inflationary economy, it is doubtful that the committees' efforts served any interest other than their own. However, I do not question the motives of any participant and I recognize that the foregoing consideration does not destroy their entitlement to reasonable compensation for their efforts.

The Act intends that active participation by creditors be encouraged. *Calhoun v. Hertwig,* 5 Cir. 1966, 363 F.2d 257, 262. A major objective of the Act was to prevent Chapter X proceedings from being run for the benefit of a few insiders. Committees are encouraged to control this problem. The judicial energy spent to this same purpose suggests to me that committees may be a part of the problem rather than the solution. 6A *Collier on Bankruptcy,* (14th ed.) § 13.01, notes 23–26. Nevertheless, the clear intent of the Act requires some allowance to these committees. The foregoing considerations may only affect the amount.

I believe that the S.E.C. has made inadequate allowance for the prodigious duplication in the representation of two committees, the Protective and the Properties Committees.

With respect to the G.A.C. Corporation Committee, I accept the S.E.C. recommendation for Greenberg, Traurig, $285,000 or an additional $218,000, and the S.E.C. recommendation that the committee chairman, Bollt, receive no compensation.

With respect to the G.A.C. Protective Committee, I find that reasonable compensation for Nemser & Nemser is $200,000, Shapiro is $80,000 and their local counsel, Layne & Brill is $70,000 or a total of $171,000 more than they have received. I accept the S.E.C. recommendation that the committee chairman was adequately compensated by Judge Hyman and that his estate receive no further compensation.

The S.E.C. recommended that Goell, an accountant who assisted this committee should receive $22,000. I disagree. His employment was never authorized. He has already received $35,000 from the trustees for other services which were also never authorized as required by Bankruptcy Rules 10–206 and 215. 13A *Collier on Bankruptcy,* (14th ed.) ¶ 10–215.06, n.26. No other committee required an accountant. This record does not reflect that Goell's services were reasonably necessary. If they were, the services of Shapiro, the committee's "numbers man" was a complete duplication.

With respect to the G.A.C. Properties Credit Committee, I find that reasonable compensation for Robinson & Wolas is $150,000, for Millen is $85,000 and for their local counsel, Sandler, is $70,000 or a total of $140,250 more than they have received. It should be noted that Mr. Wolas, an exceptionally able attorney who engineered the Ahmanson settlement, was also representing the interest of his firm and himself in this matter. Between them, they owned

over $750,000 G.A.C. debentures. It should also be noted that Mr. Millen has been appointed a trustee of the Liquidating Trust established by the plan in this case. That provides an annual salary of $24,000. I quite agree with the S.E.C. that committee chairman Berkowitz, who has already received $30,000 from Judge Hyman, has been fully compensated for his services.

■ *Other Applicants.* There are six remaining applications by creditors. Bankruptcy Rule 10–215(c)(1)(B) provides in part that:

"Reasonable compensation and reimbursement of expenses may be allowed by the court to creditors...and any other parties in interest, and the attorneys or agents for any of them... *for services which are beneficial in the administration of the estate* ...".

These creditors enjoyed no official status in the case, nor did they contribute to the formulation, approval or confirmation of the plan that was approved. It is the applicants' burden to demonstrate a benefit to all creditors or at least to a class affected by the reorganization, as distinguished from benefits strictly in the interest of a particular client. *Calhoun v. Hertwig*, 5 Cir. 1966, 363 F.2d 257, 262; *Young v. Higbee*, 324 U.S. 204, 209–214, 65 S.Ct. 594, 597–599, 89 L.Ed. 890 (1945); 13A *Collier on Bankruptcy* (14th ed.) ¶ 10–215.07.

Lovitt & Hannan and Murray Weil are attorneys in, respectively, Arizona and Miami who filed class actions for lot holders against the debtors before bankruptcy. The actions were consolidated and settled. The debtors agreed to pay about $1 million in fees and costs and made certain commitments to the lot holders. Counsel now seek over $100,000 in additional fees for monitoring these proceedings to insure that their client, the class, is protected in its claim and that their claim for their fees (payable over four years) is also protected.

The S.E.C. recommends payment of $22,-500. I accept the recommendation, because the attorneys represented a class affected by the proceedings and, therefore, by their activity, served the statutory purpose:

"... to insure the vigorous representation of all security holders and the protection of minority groups." *Calhoun v. Hertwig*, supra.

Carlton, Fields, etc., were counsel for three Florida counties that held the debtors' agreements to develop subdivided land. Counsel were retained by the counties to preserve the benefits of these agreements. They did so. They have been paid $78,188 by the counties and seek reimbursement from the estate. The S.E.C. recommends payment of the full amount. I disagree. There has been no showing here that these services fall within the scope of Bankruptcy Rule 10–215(c)(1)(B). The S.E.C. concedes as much. If, as the S.E.C. suggests, it would be equitable for the debtors to bear this expense, this expense was part of the counties' cause of action against the debtors which they settled. They ought not to be heard now to claim more for the debtors' default than they have already accepted in settlement of that claim. *Calhoun v. Hertwig*, supra.

Travelers Insurance Co., and its attorneys Wolff and Welbaum, Zook, Jones & Williams, are in much the same position. Travelers was the debtors' surety on the foregoing subdivision improvement agreements with the counties. Counsel were engaged to protect Travelers' interests. They did so. They now seek over $300,000 from this estate, three times their normal billing rate. They have been paid by their clients at their normal billing rates. The S.E.C. recommends payment of $25,000. I disagree for the same reason the counties are denied reimbursement of their legal expenses. Travelers' attorneys merely stated their client's demands and got them with no significant concessions. This cleared the way for a similar "settlement" with the counties. The benefit to the debtors was purely incidental to Travelers and the counties getting essentially what each wanted. They are entitled to no more from this estate.

Wolff has also filed two other applications, in connection with his representation of his clients the Biancos, and Halfond. I agree with the S.E.C. recommendation that

the Bianco application be denied. I also agree with the S.E.C. recommendation as to the Halfond application that Wolff receive a fee of $13,500 and reimbursement of all expenses advanced by him, $51,131.

Poole, an individual creditor, not an attorney, who lives in the Miami area, has applied for fees and expenses of over $17,000. The S.E.C. is right. There is no basis for this application.

*Expenses.* A large part of the expenses incurred by the foregoing applicants have already been paid in previously authorized interim allowances and in unauthorized direct payments made by the debtors at Callahan's direction. These direct payments, after certain recaptured refunds, have since been ratified. The S.E.C. recommends payment in full of an additional $296,943.22 expenses now claimed.

■ Many of the claimed expenses include the ordinary expenses of operating a law office, such as local transportation, secretarial overtime, postage, and the cost of photocopies which have replaced carbon copies. Such items are already included in the allowance to attorneys. 13A *Collier on Bankruptcy,* (14th ed.) ¶ 10–215.07, n.53 and 54. I have disallowed such items, except where the postage and photocopy expense was completely out of the ordinary, as sometimes happened in providing mailings to all or a large segment of the 40,000 creditors involved in this case.

In many other instances, the claim for expenses was too fragmentary to survive even casual scrutiny. In such instances, the item has been denied.

An attached schedule summarizes the applications and allowances, including the expenses covered by this order. As has been stated, a separate final and appealable order implementing this memorandum is being entered this day on each application in accordance with the provisions of 921(a). Copies of the individual orders will be sent only to the parties directly affected.

| | APPLICANTS REQUEST | | S.E.C. RECOMMENDATIONS | | COURT ALLOWANCES | | |
|---|---|---|---|---|---|---|---|
| Court Appointees | Amount | Interim Paid | Amount | Court Allowance | Amount Unpaid | Expenses Allowed |
| **Trustees** | | | | | | |
| Frank J. Callahan | $ 1,500,000.00 | $ 510,000 | $ 1,375,000 | $ 628,000 | $118,000 | –0– |
| Herbert S. Freehling | 680,000.00 | 340,000 | 340,000 | 340,000 | –0– | –0– |
| **General Counsel** | | | | | | |
| Blackwell, Walker | 3,300,000.00 | 1,559,052.00 | 2,450,000 | 2,545,000 | 985,948 | 2,417.45 |
| James Yacos (member of firm) | 600,000.00 | 268,500.00 | 500,000 | | | |
| James Yacos (sole practitioner) | 850,000.00 | 189,425.00 | 490,000 | | | 113.50 |
| James Yacos (combined) | 1,450,000.00 | 457,925.00 | 990,000 | 650,000 | 192,075 | |
| **Special Counsel** | | | | | | |
| Irell & Manella (Tax Matters) | 325,258.00 | 110,888.00 | 250,000 | 200,000 | 89,112 | 36.95 |
| Britton, Cohen, et al (Remuda foreclosure) | 32,050.00 | –0– | 32,050 | 32,050 | 32,050 | 896.48 |
| Molloy, Jones, Donahue et al (Arizona land problems) | 2,355.53 | –0– | 2,355.53 | 2,355.53 | 2,355. | 6.80 |
| Baldwin & Haspel (Brand names) | 5,328.85 | 2,556.59 | 5,328.85 | 5,328.85 | 2,772. | 401.26 |
| **Indenture Trustees** | | | | | | |
| Citibank N.A (GAC Corp. 5⅞% Debentures) | 68,599.53 | | 68,599.53 | 68,599 | 68,599 | 23,264.86 |
| Shearman & Sterling Counsel | 366,300.00 | | Combined allowance | Combined allowance | Combined allowance | 22,342.83 |
| Bradford, Williams et al, local counsel | 124,442.00 | | 325,000.00 | 150,000 | 150,000 | |
| | 559,341. | | | | | |

| Court Appointees | APPLICANTS REQUEST Amount | Interim Paid | S.E.C. RECOMMENDATIONS Amount | Court Allowance | COURT ALLOWANCES Amount Unpaid | Expenses Allowed |
|---|---|---|---|---|---|---|
| Bank of America National Trust and Savings Association (GAC Properties Credit 12% Debentures) | 20,000 | | 20,000 | 20,000 | 20,000 | 51,324.51 |
| Orrick, Herrington et al, Counsel | 198,481.25 | | Combined allowance | Combined allowance | Combined allowance | 2,885.98 |
| Gunn, Venney & Buhler Local counsel | 124,666.00 | | 215,000 | 150,000 | 150,000 | 2,424.81 |
| | 343,147 | | | | | |
| Chemical Bank (GAC Properties Credit 11% debentures) | 99,771.75 | | 69,771.75 | 69,771 | 69,771 | –0– |
| Cravath, Swaine & Moore, counsel | 178,095.50 | | Combined allowance | Combined allowance | Combined allowance | 18,832.50 |
| Steel, Hector & Davis, Local counsel | 94,349.50 | | 215,000 | 150,000 | 150,000 | 1,784.39 |
| | 372,216 | | | | | |

**GAC CORP. COMMITTEE**

| Court Appointees | Amount | Interim Paid | Amount | Court Allowance | Amount Unpaid | Expenses Allowed |
|---|---|---|---|---|---|---|
| T. Bollt, Chairman | 25,000.00 | –0– | –0– | –0– | | |
| Greenberg, Traurig Counsel | 580,000.00 | 67,000 | 285,000 | 285,000 | 218,000 | 4,506.14 |
| | 605,000.00 | | | | | |

**Protective Committee**
**Credit Debentures**

| Court Appointees | Amount | Interim Paid | Amount | Court Allowance | Amount Unpaid | Expenses Allowed |
|---|---|---|---|---|---|---|
| L. Farland, Chairman | 75,000.00 | 25,000 | 25,000 | 25,000 | –0– | |
| Nemser & Nemser, Counsel | 588,142.00 | 104,000 | 300,000 | 200,000 | 96,000 | 3,748.56 |
| M. Shapiro, Counsel | 252,661.00 | 40,000 | 125,000 | 80,000 | 40,000 | 3,484.34 |
| Layne & Brill Local Counsel | 159,197.00 | 35,000 | 105,000 | 70,000 | 35,000 | –0– |
| D. Goell, Accountant | 24,750.00 | –0– | 22,000 | –0– | | |
| | 1,099,749.00 | | | | | |

**GAC Prop. Credit**
**Creditors Committee**

| Court Appointees | Amount | Interim Paid | Amount | Court Allowance | Amount Unpaid | Expenses Allowed |
|---|---|---|---|---|---|---|
| G. Berkowitz, Chairman | 250,961.50 | 30,000 | 30,000 | 30,000 | –0– | 2,574.38 |
| Robinson & Wolas, Counsel | 450,000.00 | 69,375 | 175,000 | 150,000 | 80,625 | 3,112.74 |
| R. Millen, Counsel | 325,000.00 | 59,375 | 110,000 | 85,000 | 25,625 | 4,535.09 |
| M. Sandler, Local Counsel | 175,000.00 | 36,000 | 80,000 | 70,000 | 34,000 | 185.00 |
| | 1,200,961.00 | | | | | |
| | 2,905,710 | | 1,257,000 | | | |

**Other Applicants**

| Court Appointees | Amount | Interim Paid | Amount | Court Allowance | Amount Unpaid | Expenses Allowed |
|---|---|---|---|---|---|---|
| Lovett & Hannah & M. Weil, Counsel for Class Action Lot Purchaser | 85,000.00 | –0– | 22,500.00 | 22,500.00 | 22,500.00 | 5,278.20 |
| Carlton Fields et al Counsel for Polk, Collier & Osceola Counties | 78,188.50 | –0– | 78,188.50 | –0– | | |
| **Travelers** | | | | | | |
| I. Wolff and Welbaum, Zook, Jones | 193,650.00 | | Combined allowance | | | |
| & Williams Co-counsel | 125,000.00 | –0– | 25,000.00 | –0– | | |
| | 318,650.00 | | | | | |
| I. Wolff Bianco Appeals | 70,500.00 | –0– | –0– | –0– | | |

| Court Appointees | APPLICANTS REQUEST | | S.E.C. RECOMMENDATIONS | COURT ALLOWANCES | | |
|---|---|---|---|---|---|---|
| | Amount | Interim Paid | Amount | Court Allowance | Amount Unpaid | Expenses Allowed |
| I. Wolff Halfond (Audit & Removal) | 127,300.00 | –0– | 13,500.00 | 13,500.00 | | 51,131.13 |
| Christopher Poole | 16,025.00 | –0– | –0– | –0– | | |
| | $12,171,072.91 | $3,446,171.59 | $7,754,294.16 | | | |

| | |
|---|---|
| Total of fees | $ 5,702,103.00 |
| Total Expenses | 205,287.90 |
| Combined Total | $ 5,907,390.90 |