**In re THE VOGUE, a Michigan corporation, Debtor.**

**Bankruptcy No. 88–11142.**

United States Bankruptcy Court, E.D. Michigan, S.D.

Oct. 19, 1988.

Michael H. Traison, Detroit, Mich., for debtor.

Raynor D. Zillgitt, Jr., Flint, Mich., for Citizens Commercial & Sav. Bank.

Conrad J. Morganstern, U.S. Trustee by Claretta Evans, Detroit, Mich.

## MEMORANDUM OPINION ON HERTZBERG, JACOB & WEINGARTEN, P.C.'S SECOND APPLICATION FOR INTERIM COMPENSATION, ET AL.

ARTHUR J. SPECTOR, Bankruptcy Judge.

On September 2, 1988, Hertzberg, Jacob & Weingarten, P.C. filed its second application for allowance of interim compensation and reimbursement of expenses as attorney for the debtor in possession. On September 20, 1988, Citizens Commercial & Savings Bank filed an objection to the application. This, of course, created a "contested matter", Bankruptcy Rule 9014,[1] which requires that the Court "find the facts specially". F.R.Civ.P. 52(a), incorporated by Bankruptcy Rule 7052. The matter was argued in Court on September 28, 1988. For the reasons expressed herein and from the bench, the fee application will be denied in part.

The bank's objection to allowance of the full amount requested was in two parts. First, it argued that many of the tasks performed by the applicant were routine, ministerial, "not necessarily legal in nature", which did not "confer a benefit upon the estate". The other part of its objection was that the time spent by the applicant in preparing and litigating its own fee applications should not be compensated by the estate as it conferred no benefit upon the estate.

██ When an experienced attorney does clerk's work, he or she should be paid clerk's wages. *In re Charles Ray Glass, Inc.*, 47 F.Supp. 428, 430 (S.D.Cal.1942); *In re Olen*, 15 B.R. 750, 8 B.C.D. 555, 5 C.B.C. 2d 944 (Bankr.E.D.Mich.1981); *In re Nu-Process Ind., Inc.*, 13 B.R. 136, 7 B.C.D. 1227, 4 C.B.C.2d 1362 (Bankr.E.D.Mich. 1981); *In re Hamilton Hdwr. Co.*, 11 B.R. 326, 331, 7 B.C.D. 963, 4 C.B.C.2d 699 (Bankr.E.D.Mich.1981); *also see, e.g., In re United Rockwool, Inc.*, 32 B.R. 558, 561 (Bankr.E.D.Va.1983); *In re Absco, Inc.*, 23 B.R. 250, 251–52 (Bankr.E.D.Pa.1982); *In re Boffey*, 14 B.R. 2 (Bankr.S.D.Fla.1981). The reason a highly-compensated attorney is highly compensated is because he or she has the skills necessary to accomplish difficult tasks. The market pays for those skills when they are in demand. However, just as nobody would hire an "F. Lee Bailey" to fight a routine traffic ticket, a bankruptcy estate should not hire a silk-stocking Wall Street law firm to handle a routine small collection matter. Here, the most highly compensated member of the applicant's firm assigned to this case, Michael H. Traison, did in fact perform some routine and ministerial work.

However, if we allow only a lower hourly rate for this simple work, we would, in essence, be establishing a sliding scale of compensation for attorneys, with the hourly rate rising as the complexity of the task increases. This, we believe, is a dangerous step, and one which does not comport with actual practices of the bar. When estab-

**1.** "If there is opposition to the relief requested, whether by motion or application or notice, the resulting proceeding thereafter must be considered a contested matter proceeding." *Norton Bankr. L. & Prac. Rule* 9014, Editor's Comment, p. 812 (1987–1988 Ed.).

lishing an hourly rate for compensation, an attorney factors into that decision the likelihood that some of the time he or she spends on an assignment will be ministerial or relatively unproductive: the attorney assumes that he or she may be required to perform some simple tasks, while other tasks might require intense concentration; some communication might be casual, while other discussions might involve crucial negotiations. These are all balanced when an hourly fee is fixed. (This also assumes that the market will pay this rate.) For the Court to decide that Mr. Traison's $130.00 hourly fee is fine for his negotiations with the Unsecured Creditors' Committee over terms of a prospective plan of reorganization, but that his time spent drafting a letter to his client—a task which is far less complex or demanding—ought to be compensated at no more than, say $75.00 per hour, is unfair and unrealistic. It ignores what goes on in "the real world". Presumably, had Mr. Traison known that some of his time would be paid at a lower scale, he might have charged more for the time spent doing more difficult work. We believe that most attorneys "blend" their rates and do not charge clients a different hourly rate based on the importance or complexity of the particular task performed. Therefore, we believe that, generally, such an objection ought not be sustained. *Accord, In re Wiedau's, Inc.,* 78 B.R. 904, 909 (Bankr.S.D.Ill.1987); *In re Jensen–Farley Pictures, Inc.,* 47 B.R. 557, 584, 12 B.C.D. 978 (Bankr.D.Utah 1985). Moreover, the fact that very little work was in-court is to be commended, not penalized. After all, Chapter 11 was intended as a negotiation device; when practiced competently, it rarely requires litigation. *In re Jones,* 32 B.R. 951, 953, 10 B.C.D. 1446, 9 C.B.C.2d 451 (Bankr.D.Utah 1983); Coogan, "Confirmation of a Plan Under the Bankruptcy Code", 32 Case Western Res.L. Rev. 301, 348 (1982).

Having said that, we do feel that such an objection has merit when the ministerial, routine or less difficult tasks tend to predominate over the more complex or important tasks during a particular fee application period. The question here is whether an unreasonably large part of the services performed were of the former character. The bank's objection included a schedule listing the time the bank felt was "extraneous and non-beneficial". After thoroughly reviewing it, we find that less than five hours of Mr. Traison's 153.7 hours falls within the category of simple, unimportant, ministerial or routine tasks. The remainder, we find, were worthy of his attention. Accordingly, we disagree with the bank's contention that "an exorbitant amount of time was spend (sic) on such services." Therefore, the first objection is DENIED.

■ A person seeking an award of compensation under § 330 or § 331 of the Bankruptcy Code has the burden of establishing that the request is reasonable. *In re Hamilton Hdwr. Co., supra; In re Olen, supra.* The bank argues that it is unreasonable to allow the applicant compensation for time spent preparing its application for compensation and for subsequently litigating the very reasonableness of those applications. Both the applicant and the bank have noted that there is most definitely a split of authority on the issue of whether time spent in preparing a fee application is compensable. Many courts deny such compensation for some very good reasons. *See 2 Collier on Bankruptcy,* ¶ 330.05[2][b] n. 20a (not a service to the estate), n. 20b (encourages requests for excessive fees), n. 20c (mere overhead of lawfirm) (15th ed. 1988) (collecting cases); *also see In re Temp–Way Corp.,* 80 B.R. 699, 706 (Bankr.E.D.Pa.1987); *In re Wiedau's, Inc., supra; In re Alan I.W. Frank Corp.,* 71 B.R. 585, 586 (Bankr.E.D.Pa. 1987); *In re Shaffer–Gordon Assoc., Inc.,* 68 B.R. 344, 348–50, 15 C.B.C.2d 1314 (Bankr.E.D.Pa.1986); *In re Holthoff,* 55 B.R. 36, 42 (Bankr.E.D.Ark.1985); *In re American Metals Corp.,* 49 B.R. 579 (Bankr.D.Kan.1985); *In re Liberal Market, Inc.,* 24 B.R. 653, 661, 9 B.C.D. 1216 (Bankr.S.D.Ohio 1982); *In re Seatrain Lines, Inc.,* 21 B.R. 194 (Bankr.S.D.N.Y. 1982). Other courts have allowed such compensation. *In re Wildman,* 72 B.R. 700, 710–11, 15 B.C.D. 1189 (Bankr.N.D. Ill.1987); *In re S.T.N. Ent., Inc.,* 70 B.R.

823, 835, 15 B.C.D. 871, 16 C.B.C.2d 1355 (Bankr.D.Vt.1987); *In re Vlachos,* 61 B.R. 473, 481 (Bankr.S.D.Ohio 1986); *In re Union Cartage Co.,* 56 B.R. 174, 178 (Bankr. N.D.Ohio 1986); *In re Baldwin–United Corp.,* 45 B.R. 381 (Bankr.S.D.Ohio 1984); *In re Rego Crescent Corp.,* 37 B.R. 1000, 1008 (Bankr.E.D.N.Y.1984) (without explanation); *cf., In re United Rockwool, Inc., supra* (where the court allowed some compensation despite opining that preparation of a fee application "is more in the nature of a cost of doing business rather than a service rendered for the debtor.")

■ Initially, we believe that the question is really factual in nature. The policy of strict economy in fee awards in bankruptcy cases, which was the law under the former Bankruptcy Act, no longer exists. *See In re Hamilton Hdwr. Co., supra.* Instead, the Code reflects a definite policy decision by Congress that attorneys should be compensated the same for their services in bankruptcy cases as in any other field of endeavor. "That spirit of economy has been abandoned under the Code in favor of the new policy that attorneys engaged in bankruptcy cases receive compensation on parity with that received by attorneys performing services in comparable situations." 2 *Collier on Bankruptcy,* ¶ 330.05[2][a] (15th ed. 1988).[2] Indeed, the Code specifically says so: "... the court may award to ... a professional person employed under section 327 or 1103 of this title, or to the debtor's attorney (1) reasonable compensation ... based on the ... cost of comparable services other than in a case under this title ...". 11 U.S.C. § 330(a).

So the first factual question is: Do attorneys normally bill their clients for the time spent in preparing their bill? The applicant conceded during argument that normally law firms do not bill their clients for the time spent in preparing their statements.

In fact, our Court of Appeals has noted (perhaps pursuant to F.R.E. 201), that "lawyers do not usually charge, and clients do not usually pay, for the time it takes lawyers to calculate their fees." *Coulter*

*v. State of Tennessee,* 805 F.2d 146, 151 (6th Cir.1986).

The second question is: Do attorneys normally bill their clients for the time spent meeting with a client to explain, discuss, negotiate or haggle over (the practical equivalent of appearing in court on a fee application) their bill? The applicant conceded at argument that they do not. He also conceded that when a client's refusal to pay a bill winds up in litigation, the law firm is unable to assess its own attorney fees incurred during the litigation as additional damages. (This, of course, is because the "American Rule" precludes this. *See Alyeska Pipeline Service Co. v. Wilderness Society,* 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975).)

The next factual question then is: Is there something inherently different in practice before a bankruptcy court which makes the process of obtaining one's fees materially more onerous than in practice outside of bankruptcy court?

Several courts have *stated* that this is the case but, so far as can be determined, none of these pronouncements were based on a finding of fact made after an evidentiary hearing on the question. The first reported decision so stating appears to be one arising out of a case under the former Bankruptcy Act. *Rose Pass Mines, Inc. v. Howard,* 615 F.2d 1088, 1093 (5th Cir.1980). Its rationale was that since the court required attorneys to file detailed accounts of the services rendered, it would be "unduly penurious to require such an accounting without granting reasonable compensation." However, this case is easily distinguishable. In that case "the creditors had been made whole before the request for compensation was made." *In re Boston and Maine Corp.,* 51 B.R. 995, 998 (D.Mass.1985).

*In re Bible Deliverance Evangelistic Church,* 39 B.R. 768, 774 (Bankr.E.D.Pa. 1984), stated that bankruptcy cases involving insolvent estates (the vast majority of cases) are like "common fund" cases, *see infra,* and so compensation for time spent in preparing the fee application is not com-

---

**2.** For this reason, many of the cases cited by the bank in its brief are no longer good precedent.

pensable. However, since this was the rare case, like *Ross Pass Mines*, involving a solvent estate, the common fund analogy was inapt; instead, the court analogized to other statutory fee cases, such as civil rights act cases, and followed them. It cited language in *Prandini v. National Tea Co.*, 585 F.2d 47, 53 (3rd Cir.1978) as follows:

> Statutorily authorized fees are not paid out of the plaintiffs' recovery, and the attorney in seeking his fee is not acting in any sense adversely to the plaintiffs' interest. Hence, the time expended by attorneys in obtaining a reasonable fee is justifiably included in the attorneys' fee application, and in the court's fee award. If an attorney is required to expend time litigating his fee claim, yet may not be compensated for that time, the attorneys' effective rate for all the hours expended on the case will be correspondingly decreased. Recognizing this fact, attorneys may become wary about taking Title VII cases, civil rights cases, or other cases for which attorneys' fees are statutorily authorized. Such a result would not comport with the purpose behind most statutory fee authorizations, *viz,* the encouragement of attorneys to represent indigent clients and to act as private attorneys general in vindicating congressional policies....

*Accord, In re J.A. & L.C. Brown Co., Inc.*, 75 B.R. 539, 540 (E.D.Pa.1987).

The next reported decision so holding,[3] *In re Baldwin–United Corp., supra,* seized upon a holding in a civil rights act case, *Northcross v. Board of Education,* 611 F.2d 624, 637 (6th Cir.1979), that successful plaintiffs "should recover attorneys fees for the time spent litigating the fees issue itself", engrafted it into the law of bankruptcy and expanded it to include application preparation time.

Thereafter, both rationales were adopted by the Court of Appeals for the Ninth Circuit in *In re Nucorp Energy, Inc.*, 764 F.2d 655 (9th Cir.1985).[4] The court stated: "it is fundamentally inequitable to impose substantial requirements on bankruptcy counsel as prerequisites to their obtaining compensation while simultaneously denying compensation for the efforts necessary to comply with those requirements." 764 F.2d at 659.

Each of these rationales, however, is unsound. The assertion that it is "fundamentally inequitable" not to allow bankruptcy attorneys to bill their application preparation time, even if true, is beside the point. Congress directed that the standard for allowing compensation be "the cost of comparable services other than in a case under this title." Notions of "fairness" are outside the scope of our inquiry. The marketplace sets the compensation for attorneys outside of bankruptcy court. Our job is merely to compare that marketplace to the fee application pending before us. Thus, as stated earlier, the question is "*do* attorneys get compensated in non-bankruptcy cases for preparing their fees?" and not "*is it fair* to require attorneys to prepare fee applications and then not pay them for it?". It may or may not be "fair" for institutional clients outside of bankruptcy cases to demand that their attorneys itemize their bills in detailed fashion, yet, if the clients require this service and get it free of charge (or, as is more likely, merely built into the fees as part of firm overhead),

3. Discussion of the following opinions was omitted because these courts felt bound to follow *Rose Pass Mines, Inc. v. Howard,* 615 F.2d 1088 (5th Cir.1980): *In re G.A.C. Corp.,* 14 B.R. 252 (S.D.Fla.1981); *In re Warrior Drilling & Engineering Co.,* 9 B.R. 841, 7 B.C.D. 618 (Bankr.N.D.Ala.1981), *modified on other grounds,* 18 B.R. 684 (N.D.Ala.1981).

4. Some might believe that our Court of Appeals followed the reasoning of *In re Nucorp, Inc.,* 764 F.2d 655 (9th Cir.1985) in *Coulter v. State of Tennessee,* 805 F.2d 146, 151 (6th Cir.1986). It did not. The citation to *Nucorp* was "*See* cases collected and discussed in ... *Nucorp*" to refer the reader to the many cases which "uniformly hold that a lawyer should receive a fee for preparing and successfully litigating the attorney fee case after the original case is over ...". *Id.* The cases discussed in *Nucorp* were, of course, civil rights cases, as was *Coulter* itself. It was perfectly appropriate for the Sixth Circuit to follow the unbroken line of decisions allowing compensation to successful plaintiffs' attorneys in civil rights cases. The statement in *Coulter,* therefore, is *dictum* as far as bankruptcy law is concerned.

then bankruptcy courts should follow suit. Moreover, as the Supreme Court has recently reminded us, "whatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of the Bankruptcy Code." *Norwest Bank Worthington v. Ahlers,* 485 U.S. ——, 108 S.Ct. 963, 99 L.Ed.2d 169, 179 (1988).

The equation of bankruptcy cases with civil rights cases is strange indeed.[5] *Nucorp* stated that the closest parallel to the bankruptcy fee issues is "other types of cases in which fees are awarded by the court ...", primarily "statutory fee cases". 764 F.2d at 659. However, this comparison is way off the mark. Bankruptcy cases are not "statutory fee cases". In "statutory fee cases", a statute shifts the duty to pay one's attorneys fees from the party who hired the attorney to the other, losing, party in the case. In fact, the Supreme Court denominates these types of cases not as "statutory fee cases" as did the Ninth Circuit, but as cases involving a "fee-*shifting*" statute. *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air,* 478 U.S. 546, 106 S.Ct. 3088, 3098, 92 L.Ed. 2d 439 (1986) (*"Delaware I"*) (emphasis added). Does the Bankruptcy Code do the same thing? No. Section 330 merely authorizes the payment of attorneys fees by the estate—the very party for whom the applicant was employed. Section 330 allows fees to be paid by the bankruptcy estate only to professionals hired under § 327 (the trustee's professionals), § 1103 (the creditors' committee's professionals) or

the debtor's attorney,[6] all of whom have fiduciary duties due *to* the estate (i.e.: creditors) and only for services rendered *for* the estate. There simply is no fee-shifting, which is what other fee statutes do. Thus, there is no basis to compare other statutory fee cases, which are "fee-shifting" statutes, to bankruptcy cases, which are more akin to any other commercial litigation cases.

The purpose for permitting the successful plaintiff in civil rights and other "statutory fee cases" to sock the loser with his or her own attorneys fees is to encourage the filing of such suits and presumably to deter such wrongdoing in the future. *See Delaware I,* 106 S.Ct. at 3095–96; *Prandini v. National Tea Co.,* 585 F.2d at 52–53; *In re Shaffer-Gordon Assoc., Inc.,* 68 B.R. at 350. As our own Sixth Circuit explained:

> When Congress passed the Act [Civil Rights Attorney's Fees Awards Act of 1976] its basic purpose was to encourage the private prosecution of civil rights suits through the transfer of the costs of litigation to those who infringe upon basic civil rights. If a successful party in a civil rights suit is awarded attorney's fees under the Act and he cannot secure attorney's fees for legal services needed to defend the award on appeal, the underlying Congressional purpose for the Act would be frustrated.

*Weisenberger v. Huecker,* 593 F.2d 49, 53–54 (6th Cir.1979). Congress' decision to not discourage competent attorneys from the practice of bankruptcy law,[7] was effectuat-

---

5. *In re Martin Place Hospital,* 8 B.R. 770 (E.D. Mich.1981), which itself utilized the procedural standards enunciated in *Northcross v. Board of Education,* 611 F.2d 624 (6th Cir.1979), a civil rights case, did not, in so many words say that everything that happens in civil rights attorney fee cases are automatically transferable to bankruptcy cases. All it held was that the bankruptcy court's refusal to make an hourly rate assessment for the services rendered, or indeed to make any specific findings of fact at all, was error.

6. Colliers explains: "Under the Act, in order for the debtor's attorney to be entitled to an award of compensation from the estate, the services were required to be rendered 'in aid of the administration of the estate ...'. The Code

makes no change in this regard." 2 *Collier on Bankruptcy,* ¶ 330.04[3] (15th ed. 1988).

7. The House Report on § 330(a) states as follows:

> The effect of section 330 is to overrule ... cases that require fees to be determined based on notions of conservation of the estate and economy of administration. If those cases were allowed to stand, attorneys that could earn much higher incomes in other fields would leave the bankruptcy arena. Bankruptcy specialists, who enable the system to operate smoothly, efficiently and expeditiously, would be driven elsewhere, and the bankruptcy field would be occupied by those who could not find other work and those who practice bankruptcy law only occasionally al-

ed by repealing the "notions of economy" rule and by requiring bankruptcy courts to allow fees comparable to those earned in non-bankruptcy cases. *See* 124 Cong.Rec. H11,091–2 (Sept. 28, 1978); S17,408 (Oct. 6, 1978). There simply was no public policy directive .to positively "encourage" or to "promote" the filing of bankruptcy cases or to deter anybody from anything. Moreover, an award of fees for attorneys for civil rights plaintiffs is entirely contingent upon prevailing on the merits; this concept is alien to § 330. Finally, in civil rights cases, to refuse to permit the recovery of fee litigation expenses—to dilute the fees originally awarded or improperly denied— would be to deny the injured plaintiff the full relief mandated by Congress. Such reasoning has no place in bankruptcy cases.[8]

If a bankruptcy case is like any other federal court case in this regard, it is most akin to the "common fund" case also described, but inexplicably discarded by *Nucorp*, 764 F.2d at 661. The court recognized that in "fund doctrine" cases, courts allow attorneys to bill fees to the common fund (i.e., the estate), for whom the attorneys worked, for services performed in creating or enhancing the fund, but do not permit the compensation of attorneys' time in preparing their bills. Bankruptcy cases are far more analogous to these cases than to civil rights cases. *See In re Temp–Way Corp., supra; In re Alan I.W. Frank Corp., supra; In re Shaffer–Gordon Assoc., Inc., supra.*

The closest parallel to fee applications in bankruptcy cases, however, are those bills sent by law firms to the creditors in the very same bankruptcy case, which are not subject to review or approval by the bankruptcy court. The second closest parallel

would be fees earned by law firms in commercial matters including commercial litigation.

*Nucorp* and most of the other courts which agreed with it believed that the result they achieved was proper because they assumed that bankruptcy fee applications were more detailed than non-bankruptcy bills. That assumption, we believe is based upon quaint notions that clients still accept and pay bills stating no more than "For Services Rendered ... pay '$x'." Those days are long gone. Commercial clients, such as banks, insurance companies and industrial corporations, and even savvy or assertive consumer clients require itemization, which, we believe, is not much less detailed than that which is required by bankruptcy courts. At one time or another they want and get justification for each lawyer's hourly rate and an itemization of time spent and expenses incurred.

The applicant here argued that although all of this is certainly true, the narrative statement required by L.B.R. 142(a)(1)(D)-(G) (E.D.M.) is one thing the firm does in bankruptcy cases that it does not prepare for non-bankruptcy clients. Malpractice insurers regularly observe that one of the surest ways to avoid unwarranted claims is for an attorney to communicate to his or her client fully, clearly, and regularly all of the work done on the client's behalf and the benefits achieved so far. This is the narrative required by the rule.

*Nucorp* and the other cases like it *assume* that the process of submitting a fee application to a bankruptcy court is materially more onerous than submitting a bill to a client not involved in a bankruptcy case. Although this assumption might be true, no finding of that fact was made in these cases. Even those bankruptcy court deci-

---

most as public service. Bankruptcy fees that are lower than fees in other areas of the legal profession may operate properly when the attorneys appearing in bankruptcy cases do so intermittently, because a low fee in a small segment of a practice can be absorbed by other work. Bankruptcy specialists, however, if required to accept fees in all their cases that are consistently lower than fees they would receive elsewhere, will not remain in the bankruptcy field.

H.R. No. 95–595, 95th Cong., 1st Sess. 330 (1977), U.S.Code Cong. & Admin.News 1978, pp. 5787, 6286.

**8.** One exception exists, 11 U.S.C. § 523(d). It is a true "fee-shifting" statute in the Bankruptcy Code, similar in effect and in purpose to civil rights act and other fee-shifting statutes. *See* 3 *Collier on Bankruptcy,* ¶ 523.12 (15th ed. 1988).

sions which, without being bound to do so, came to the same conclusion, did so without any apparent evidentiary support. We are also cognizant that many bankruptcy judges disagree with this assumption.[9] We believe this issue is an issue of fact subject to evidentiary proof.

At the hearing on this application, we asked the applicant if it wished to submit evidence on this question. It declined, even though, as the applicant, it bore the risk of non-persuasion. We conclude therefore, that the applicant has failed to establish as a fact that fee applications in bankruptcy cases are materially more onerous, i.e., more itemized and complete with respect to services rendered and expenses incurred, than periodic billing statements to commercial clients. Therefore, by requesting compensation for the time necessary to prepare its bill and to litigate it, the applicant is seeking not to be treated as all other attorneys in non-bankruptcy practice, but to be paid something in excess thereof.

Instead, the applicant *argued* that because the "bill" has to be sent to so many separate entities (such as the court, the debtor in possession, the United States Trustee, the creditors' committee) and because so many others, i.e., all other interested parties, have the right to review it and to object to its allowance, there is a much greater likelihood for a fee dispute in a bankruptcy case than when sending an

itemized statement to a private client.[10] Although the applicant had the opportunity to offer evidence to support this argument, as indicated, it declined. We certainly cannot take notice of such a proposition. Indeed, courts have noted the traditional reluctance of attorneys to contest the fees of their brethren.

> Attorneys for creditors' committees all too often sacrifice the rights of their clients and violate their duty as court-appointed officers on the altar of self-interest. The knowledge that voiced objections may invite retaliation, suffices to secure their acquiescence to fee requests, no matter how patently excessive.[1] And creditors without representation are, for many obvious reasons, unable to lodge any effective and meaningful objections.

> ---
> [1] The Bankruptcy Bar is a relatively closed society. The same attorneys generally appear in varying capacities in almost all substantial chapter 11 cases. Such continuing association fosters a club atmosphere which militates against effective client representation in matters relating to compensation. The court, thus, is faced with the difficult and delicate task of fixing fair and just compensation without the input of those who are in the best position to evaluate the fee request.

*In re Hamilton Hdwr. Co.*, 11 B.R. at 330. In addition, it is human nature that as responsibility is diffused, the likelihood of

---

**9.** When this opinion was almost complete, we were furnished a copy of one of what we believe is a great number of unpublished decisions denying compensation for fee application preparation. In *In re First Guaranty Venture Corp.*, Bky 4–82–599 (D.Minn., May 12, 1988) [available on WESTLAW, 1988 WL102819], Judge Dreher decided that fee application preparation time is non-compensable under § 330 because "[m]ost bankruptcy attorneys do not charge (indeed could not charge) their clients for the time spent preparing a client's bill, for a multitude of reasons. In the bankruptcy context, the rule should be the same." Bky. No. 4–82–599 at p. 4. She stated:

> Based on my experience, it is not ordinary to send any client a bill for preparing the bill, and I seriously doubt that it could be established that secured creditors' counsel or counsel rendering business legal advice outside the bankruptcy context send bills which contain a detailed entry for "Preparation of Bill". Rather, in this context, as in other comparable contexts, the time and effort spent on prepar-

ing a bill (or in this case a fee application) should be viewed as overhead, or a cost of doing business; costs subsumed in the significant hourly rates charged by this counsel and by most business-oriented counsel.

*Id.* at p. 7. Similarly, Senior District Judge Murray noted: "The court has been satisfied throughout its many years on the bench that there is no dearth of competent lawyers willing to accept appointments in bankruptcy cases absent the added incentive of compensation for preparing fee petitions." *In re Boston and Maine Corp.*, 51 B.R. 995, 999 (D.Mass.1985). Obviously, on this record, we concur with these findings.

**10.** If monthly statements are the norm outside of bankruptcy, this would require four times the fee application preparation than is necessary in bankruptcy courts since ordinarily one cannot request fees in bankruptcy court more than once every 120 days. 11 U.S.C. § 331.

action is diminished. Therefore, since each creditor has a (sometimes small) share of the estate, it is rarely in its interest to hire an attorney [11] to fight a fee application. Moreover, when a law firm requests approval of its fees, the creditors are not asked to immediately dig into their own pockets to pay the bill, whereas a client receiving a statement is usually required to pay it within 30 days. Again, it is human nature that one who is requested to pay is more apt to complain or stall than a diffuse bunch of creditors who have no obligation to directly pay a dime out of their own pockets. Many unsecured creditors have the sometimes erroneous view that once their debtor has filed a bankruptcy petition, their money is gone forever and it's just throwing good money after bad to actively participate in the proceedings, even though, unless the estate is solvent, the professional fees will be borne by them in the form of a reduced dividend. Psychologically, bankruptcy fees paid out of an estate are not the same as a private client opening its checkbook to pay an attorney's bill. Therefore, if there is a difference between the hardship in getting paid in a private case and in a Chapter 11 case, it might be strongly argued that the former is greater than the latter.

We have been shown a copy of a recent unpublished decision by one of the 19 district judges in this district, which reversed a bankruptcy judge's decision to disallow compensation under § 330 to a law firm for time spent in preparing its fee application. *In re Pontiac Hotel Associates*, 92 B.R. 715 (E.D.Mich.1988). In that case, Bankruptcy Judge Brody, *sua sponte*, denied compensation for the questioned time. He did so without a written opinion and with only a perfunctory hearing. Thus, just as in the other cases discussed in this opinion, no fact-finding was conducted. As a re-

sult, the district court's reversal on the stated grounds that *Nucorp*'s "fundamentally inequitable" determination was "persuasive" is based on the same lack of evidence. as the other decisions. Because Judge Brody authored no opinion, we don't know, but we may assume, that he denied compensation because he felt that there is no material difference between the process of applying to the Bankruptcy Court for allowance of fees and billing a paying client. If this determination was error, it was factual in nature, and should have been reversed only if "clearly erroneous". Bankruptcy Rule 8013. This same comment, of course, holds true for *Nucorp*.

As noted, Judge Brody's decision was not the result of a "contested matter", Bankruptcy Rule 9014, since nobody objected to the fee application. Instead, he apparently raised the non-compensability of the time in question *sua sponte*, as is appropriate in fee application matters. *In re Hamilton Hdwr. Co., supra*. The problem with such a procedure is that the absence of a written opinion below and an appellee's brief in support of the trial court's determination, leaves the appellate court to rule by default. The persuasiveness of such opinions therefore must be suspect.[12]

Furthermore, the opinion is unpublished. We simply do not know how many unpublished decisions from the other 18 judges of our district court there are which have affirmed bankruptcy court determinations to deny compensation for this sort of time. For this reason, and with the utmost respect for the wisdom and experience of the judge who authored *Pontiac Hotel Associates*, we believe we are neither bound nor persuaded to follow it.

Therefore, the objection by the bank as to this issue is SUSTAINED. The applicant has identified $2,527.50 of the bill as

---

**11.** Partnership and corporate creditors must hire counsel to litigate a contested matter. *United States v. Reeves,* 431 F.2d 1187 (9th Cir. 1970); *In re Victor Publishers, Inc.,* 545 F.2d 285 (1st Cir.1976); *Ginger v. Cohn,* 426 F.2d 1385 (6th Cir.1970); *First Amendment Foundation v. Village of Brookfield,* 575 F.Supp. 1207 (N.D.Ill. 1983); *Turner v. American Bar Ass'n,* 407

F.Supp. 451 (N.D.Tex.1975). Most others are well advised to do so.

**12.** At least one appellate court has held that in such circumstances, the matter must be remanded to the bankruptcy court for fact-finding. *In re Botelho,* 8 B.R. 305, 3 C.B.C.2d 739 (1st Cir. BAP 1981).

being derived from time spent in preparing its fee applications and $835.00 for litigating its last fee application. Therefore, an order will enter allowing interim compensation and reimbursement of expenses to Hertzberg, Jacob & Weingarten, P.C. in the amount of $21,447.50, which is computed by deducting $3,362.50 from the $24,810.00 requested.