**In re Gerald ARNOLD, Debtor.**

**Bankruptcy No. 89–11728.**

United States Bankruptcy Court,
E.D. Michigan, S.D.
Flint.

Dec. 21, 1993.

---

Shermeta, Chimko & Kilpatrick, Rochester Hills, MI.

Thomas J. Bleau, Bay City, MI, Trustee.

## OPINION RE: APPLICATION OF SHERMETA, CHIMKO & KILPA-TRICK FOR COMPENSATION FOR LEGAL SERVICES RENDERED TO CHAPTER 7 TRUSTEE

ARTHUR J. SPECTOR, Bankruptcy Judge.

Shermeta, Chimko & Kilpatrick filed an application requesting allowance of $13,-105.50 for compensation for legal services rendered to the chapter 7 trustee between August 31, 1989 and October 31, 1992. In considering the appropriate level of compensation for the applicant's services, I must utilize the "lodestar method" endorsed by the Sixth Circuit in *In re Boddy*, 950 F.2d 334, 337 (6th Cir.1991). This method entails "multiplying the attorney's reasonable hourly rate by the number of hours reasonably expended." *Id.* (quoting *Grant v. George Schumann Tire & Battery Co.*, 908 F.2d 874, 879 (11th Cir.1990)). Before launching this in-quiry, however, a few preliminary observations are in order.

Determination of the "reasonable" hourly rate for an applicant's legal services is essentially an evidentiary matter, wherein the court attempts to approximate the market rate for an attorney with the applicant's skills, training and experience. *In re The Vogue*, 92 B.R. 717, 720–21 (Bankr.E.D.Mich. 1988). Reference to these factors is appropriate because the market generally assigns a greater value to services rendered by "proven" lawyers than to lawyers with less impressive credentials. At least one reason why the market behaves in this fashion is that the public perceives a positive correlation between a lawyer's qualifications and the quality of services that will be provided. In essence, an attorney's background serves as a means by which the client can predict the degree of competency that he or she is purchasing.

But like most prognostic methods, reference to an attorney's qualifications and experience is an imperfect tool. A prestigious law firm, such as this one, may thoroughly botch a law suit, while a fledgling may prove to be highly creative and resourceful in the way that she handles her first-ever trial. Thus the determination of the market rate for a particular applicant's services should not necessarily end a court's analysis. If the applicant's performance is substantially better or worse than predicted by the market based on the applicant's track record, then an upward or downward adjustment in the hourly rate may be appropriate. *See Furtado v. Bishop*, 635 F.2d 915, 920 (1st Cir.1980) (The lodestar fee may be "adjusted upward or downward to reflect ... quality of representation (i.e., an unusually good or poor performance above or below the skill already reflected in the hourly rate)."); *Cf. Boddy*, 950 F.2d at 338 ("[T]he lodestar presumably subsumes all of these factors [1] in its analysis

---

1. This reference is to 12 factors cited as relevant in fee-application cases by the court in *In re Harmon*, 772 F.2d 1150, 1152 n. 1 (4th Cir. 1985). Among the factors listed in *Harmon* is "the skill required to properly perform the legal services rendered." *Id.* And, as the court subsequently noted, "one of the primary determinants of the quality of work performed is the results obtained." *Rawlings v. Prudential–Bache Properties, Inc.*, 9 F.3d 513 (6th Cir.1993) (quoting *Lindy Bros. Builders, Inc. of Phila. v. American Radiator & Standard Sanitary Corp.*, 487 F.2d 161, 168 (3d Cir.1973)); *see also, Hensley v. Eckerhart*, 461 U.S. 424, 434–36, 103 S.Ct. 1933, 1939–41, 76 L.Ed.2d 40 (1983).

of the *reasonable* hourly rate and the *reasonable* hours worked.").

The other variable to be determined under the lodestar method is the number of hours reasonably expended by the applicant. The number of factors potentially relevant to this determination probably borders on the infinite. *See Faison v. City of New York*, No. 79 Civ. 3175, 1994 WL 28625 (S.D.N.Y. June 27, 1983) (available on LEXIS) ("The fair assessment of attorney's fees requires freedom to make adjustment for an infinite variety of factors which cannot be definitively listed in advance.").

■ Stated simply, however, the court must determine whether the hours invested by the applicant in a particular task are justifiable given the probable benefit to the applicant's client. *In re MCorp. Financial, Inc.*, 160 B.R. 941, 951 (S.D.Tex.1993) (the value of litigation "is the expected outcome[ ] ... multiplied by the likelihood of [that] outcome [ ] less time-adjusted expenses and less the opportunity costs in the meantime."), *see also id.* at 958. "If it appears that litigation would cost more than the expected return, there is a duty not to commence the litigation." *In re Great Sweats, Inc.*, 113 B.R. 240, 242 (Bankr.E.D.Va.1990); *Unsecured Creditors' Comm. v. Puget Sound Plywood, Inc.*, 924 F.2d 955, 958–59 (5th Cir.1991) (among other things an attorney is "obligated to consider" before litigating is: "Is the burden of the probable cost of legal services disproportionately large in relation to the size of the estate and maximum probable recovery?"). *See, e.g., Great Sweats, supra* (poor judgment to incur $2,218.75 in fees on a $2,000 preference); *In re Mayes*, 101 B.R. 494, 498 (Bankr.W.D.Mich.1988) (poor judgment to spend 10.4 hours deciding whether to seek to recover a $1,924.38 preference); *In re WHET, Inc.*, 62 B.R. 770, 777–78 (Bankr. D.Mass.1986) (poor judgment to spend $9,568 in fees to collect $3,413.75 in accounts receivable). In weighing these considerations, the court should resist the temptation to engage in "20/20 hindsight," and focus instead on facts known (or which should have been known) to the applicant at critical points during the pendency of the case. *See Wool-*

*ridge v. Marlene Industries*, 898 F.2d 1169, 1177 (6th Cir.1990) ("[T]he standard is whether a reasonable attorney would have believed the work to be reasonably expended in pursuit of success at the point in time when the work was performed.").

Utilizing these guidelines, I will now determine the appropriate compensation for the applicant. In compliance with L.B.R. 3.03 (E.D.M.), governing the content of fee applications, the applicant described in general terms five different adversary proceedings it instigated on behalf of the trustee. Contrary to subsection (a)(5)(E) of that rule, however, the application does not "describe the results obtained" by the applicant in these lawsuits. A review of these five adversary proceedings gives some insight into why this information was not freely offered by the applicant.

### A.P. No. 89–1166

### Bleau v. Gerald Arnold

■ By my estimate,[2] the applicant claims to have expended 39.6 hours pursuing the trustee's objection to the Debtor's discharge. The trustee has the duty to object to a debtor's discharge "if advisable." 11 U.S.C. § 704(6). Because denial of a discharge is so serious a matter, a trustee ought not lightly bring an action under § 727(a). *Cf. In re Weber*, 99 B.R. 1001, 1017 (Bankr. D.Utah 1989) (describing denial of discharge as a "drastic remedy"); *In re Johnson*, 98 B.R. 359, 366 (Bankr.N.D.Ill.1988) (calling denial of discharge a "drastic ... punishment"). Therefore, counsel for a trustee is justified in devoting substantial effort in investigating the facts and researching the law before and after filing a suit to deny discharge. Especially since the action here was tried to conclusion, I find that all of the time expended was reasonably necessary for the adversary proceeding.

■ Although the trustee did not prevail, my recollection of the merits of that case is such that I believe the trustee was justified in hiring counsel to investigate and ultimately pursue the action. Counsel did a workmanlike job in getting the matter to trial and

---

2. In this district, attorneys are not required to itemize their applications for compensation by task, and the applicant here did not volunteer to do so. So the Court undertook the job.

in presenting the evidence to the Court. The hourly rates billed by the applicant's professionals and para-professionals are well within the market price. Although the objection to the discharge was overruled, the applicant is not an insurer of the results of litigation. It is entitled to the compensation it requests for these services. Its request for compensation of $4,053.75 (35.85 hours × $100/hr. + 3.75 hrs. × $125/hr.) will be allowed.

### A.P. No. 90–1116

### Bleau v. First of America Bank

■ The second adversary proceeding referenced by the applicant was a lawsuit against First of America Bank to recover an alleged preference for monies garnished prepetition. That case had some potential legal merit, but it too ultimately proved unsuccessful. *See In re Arnold,* 132 B.R. 13 (Bankr. E.D.Mich.1991). It appears that the firm expended 10.6 hours working on this litigation. In this lawsuit, the trustee sought to recover as a preference $1,598.24 received by the bank through a garnishment of the debtor's state tax refund. The legal issue— whether a garnishment is effective upon the bank's receipt of payment from the garnishee (in which case, the transfer was within the 90–day preference period) or upon service of the writ (in which case the transfer was outside that period)—was novel and required legal research and writing. However, the amount in dispute—$1,598.24—did not justify the effort put forth.

■ Counsel's 10.6 hours of effort equates to a fee request for this work of $1,060. A lawyer must consider the amount in dispute and discount that by the likelihood of success in order to properly evaluate the worth of litigation, and then owes a professional duty to the client to recommend that no action be commenced if the cost of the battle exceeds the value of the litigation. *Great Sweats,* 113 B.R. at 242–43. In this case, I assess the trustee's likelihood of success on the merits of the issue, as seen from the inception of the litigation and not with hindsight, as 50–50. Thus, the value of the litigation was never greater than about $800. Counsel's expenditure of its time—as Abraham Lincoln said, a lawyer's "stock in trade," *see Martin v. University of South Alabama,* 911 F.2d 604, 611 (11th Cir.1990)—beyond the $800 value of the case was understandable (once in a case it's nice to win it), but it must be viewed as gratuitous. Certainly, in the nonbankruptcy (real) world, counsel would have difficulty, to say the least, explaining to a client why the client should pay the lawyer over $1,000 for a case whose worth never exceeded $800.[3] In my opinion, at the rate of compensation of $100 per hour billed by the applicant for the services of an associate, which I deem to be a reasonable rate, the number of hours to have expended in attempting to recover the alleged preference should not have exceeded five. Accordingly, for the First of America litigation, I conclude that compensation should be limited to $500.

### A.P. No. 90–1120

### Bleau v. Donna Arnold, Jeffrey Arnold and James Gillespie

■ In this adversary proceeding, the trustee sought to recover the value of four horses which the Debtor had transferred to his wife, his son, and a friend/business associate. Since the Debtor owned only a fractional interest in three of them, the value of the horses to the estate was limited to $4,275 and therefore that was the maximum recovery the trustee could have achieved. As in the other cases, the trustee had a duty to investigate what appeared to be questionable transactions, to bring suit to avoid them if it was advisable, and to have counsel assist him in the performance of those duties.

After trial, the Court held that the transfer of one horse to Mrs. Arnold was fraudulent, entered a judgment against her in the amount of $2,375; but held that the other defendants did not receive a fraudulent transfer. The trustee won about half of what

---

**3.** This discussion does not even factor in the serious possibility that had the Court's decision gone the other way, the bank would have appealed it to avoid what might have been seen as a bad precedent. The cost of possibly two appeals should also have been considered by counsel before embarking down the litigation path.

he sought. To obtain that partial victory for its client, counsel expended 28.8 hours of its time at the rate of $100 per hour for a total investment of $2,880.

It is difficult to prove under state law that a transfer was fraudulent. The debtor is not likely to admit that he intended to hinder, delay or defraud his creditors (Mich.Comp. Laws § 566.17), and here the Debtor vigorously denied that allegation. And since satisfaction of an antecedent indebtedness is recognized as value under state law *Nicholson v. Scott*, 50 F.Supp. 209 (E.D.Mich.1943); *Plymouth United Sav. Bank v. Lee*, 278 Mich. 545, 270 N.W. 781 (1937), and especially where the value of assets transferred are subject to a wide difference of opinion, it is no simple matter to prove constructive fraud (Mich.Comp.Laws § 566.16). Counsel did as well as could be expected in obtaining even the partial victory.

But here again one must question counsel's judgment about the time it devoted to the task. Even if the trustee prevailed in full he would have obtained a judgment for $4,275. Yet counsel spent $3,530 worth of its time to get that far. And if any one of the three Defendants had appealed, the slight net gain to the estate would have evaporated.

Looking at the big picture at the beginning of the case, as I believe counsel had a duty to do, it would have advised the trustee that the maximum recovery was $4,275, that the likelihood of succeeding on the merits was approximately 75% (in my opinion), therefore the cause of action was "worth" about $3,200, and that the trustee should decide whether it made good business sense to bring suit, and if so, whether a cap on fees should have been negotiated. In bankruptcy, where the trustee is not using his own money to hire counsel, it is all too easy to let counsel run the case. That appears to be what happened in this as well as the other adversary proceedings involved.[4] At the rate of compensation of $100 per hour for an associate, the number

of hours expended to recover this fraudulent conveyance should not have exceeded 20. Accordingly for this litigation, I conclude that compensation should be limited to $2,000.

### A.P. No. 90–1124

### Bleau v. Marie Russell

■ The fourth lawsuit identified in the application was against the Debtor's mother, Marie Russell. The complaint alleged that the Debtor's transfer of his home to the Defendant was fraudulent under state law. This was a cause of action which had real potential. For the reasons explained below, however, I believe that the case was lost to the estate solely due to counsel's mistakes.

The complaint sought the return of the home, which was conceded to be worth $63,-000.[5] In her answer, the Defendant claimed that she paid a good and valuable consideration for the home in the form of cancellation of indebtedness. At the pre-trial conference, the Court noted that the answer more or less admitted the receipt of a preference and asked the applicant whether the Plaintiff wished leave to amend the complaint to add a count seeking avoidance under 11 U.S.C. § 547(b). The applicant affirmatively opted not to so amend the complaint. The joint final pre-trial order prepared by counsel for the Plaintiff contained no reference to a § 547(b)–type transfer or a cause of action to recover the preference. The question came up again at trial. After presenting its proofs at trial, which failed to prove a fraudulent transfer, the applicant for the first time moved to amend the complaint to add the § 547(b) theory. After vigorous objection by the defense, the motion was denied. In addition to the obvious procedural problem, the Court noted that even if it granted the motion, it would serve no purpose because the trustee failed to prove the § 547(b)(5) element of his cause of action for recovery of a preference. Therefore, not only did the trustee's counsel fail to allege a preference, it also failed to prove one, notwithstanding the

---

4. A lay observer comparing the dollar amount of the estate remaining for distribution ($3,025.26), with the dollar amount of the fees requested ($13,105.50) could be forgiven for believing that the entire bankruptcy case was run for the benefit of counsel and not for the creditors.

5. The Debtor owned only a half interest in the home, which was encumbered to the extent of approximately $30,000. Thus the maximum value of the asset to the estate was only about $16,500, rather than the full $63,000.

late request for leave to amend the complaint.

What is most important to note here is that at no time did the Defendant ever take the position that she had not received a preference or that she had some defense to an action to recover the preference. However, because of the applicant's failure to properly argue and present this case, a valuable asset was lost to the estate.

To research, draft pleadings, investigate, exchange discovery, prepare for trial and try the case, the applicant expended 32.25 hours, at a billed cost to the estate of $3,225.00. I find that the number of hours devoted to this litigation was reasonable for the issue and amount in dispute. However, in light of the manner in which the work was performed, I cannot ascribe any value to the hourly rate. I therefore conclude that the applicant is entitled to no compensation for its work in this adversary proceeding.

### A.P. No. 90–1123

### Bleau v. Stella Neering, dba Neering's Tax Service

Finally, the application refers to an adversary proceeding against the Debtor's former accountant, Stella Neering d/b/a Neering's Tax Service, for turnover of books and records. That case was voluntarily dismissed with no apparent net benefit to the estate.[6] The time devoted to this proceeding was eight hours at a billed cost of $800. As the litigation was of no value to the estate, the services in prosecuting it are likewise valueless, and therefore not "necessary." 11 U.S.C. § 330(a)(1); *In re Lederman Ent.,*

*Inc.,* 997 F.2d 1321, 1323 (10th Cir.1993) ("An element of whether the services were 'necessary' is whether they benefited the bankruptcy estate."). Accordingly, no compensation will be awarded for this task.

In addition to the time spent litigating these adversary proceedings, the applicant rendered general legal services to the estate for which it has billed a reasonable $710.25. Those services were actually performed and were necessary. Accordingly, the applicant will be allowed the full $710.25.

To recapitulate, the applicant's legal services for the trustee were reasonably worth $7,264 ($4,053.75 + $500 + $2,000 + $0 + $0 + $710.25). An order allowing such compensation will be entered.

---

6. If the estate did indeed benefit from this litigation, such benefit is not explained in the fee application, although it is required by L.B.R. 3.03(a)(4), (5). In pertinent part, this rule states:
  (a) *Form and Content of Attorney Fee Application.*
    In addition to the disclosures required by Bankruptcy Rule 2016(a), an application for an award of attorney fees filed pursuant to 11 U.S.C. § 330 or § 331 shall, in the following lettered paragraphs comply with sub-paragraphs (1)–(9) below and include the exhibits described in subparagraphs (10)–(14) below.

  (4) Describe specifically the benefits conferred on the bankruptcy estate by the services rendered;

  (5) Unless unduly burdensome, with respect to each adversary proceeding in which the applicant is or was involved, describe:
    (A) the nature of the action instituted;
    (B) the relief requested;
    (C) the dollar amount directly or indirectly involved;
    (D) the issues, both factual and legal, in sufficient detail to permit the Court to evaluate the problems confronting the attorney; and
    (E) the results obtained.