**In re UNITCAST, INC. fka William Cook North American Unitcast, Inc., Debtor.**

**Bankruptcy No. 93–31383.**

United States Bankruptcy Court, N.D. Ohio.

July 1, 1997.

## MEMORANDUM OPINION
## AND DECISION

RICHARD L. SPEER, Chief Judge.

This cause comes before the Court upon the United States Trustee's (hereafter "UST") Request for Court Determination as to Manner in which Funds Should be Distributed and Interest Upon Funds Disgorged. Also decisional is the Fourth and Final Fee Application for Allowance of Compensation and Reimbursement of Expenses of Counsel

for Debtor–in–Possession of Schottenstein, Zox & Dunn Co., L.P.A. (hereafter "SZD"), to which the UST has objected. Because this Court finds that the issues in the UST's Request and SZD's Application are related, both issues will be resolved in this Opinion. For the reasons that follow, this Court will decline to order the professionals in this case to disgorge fees and expenses paid to them during the course of the preconversion Debtor's operations based solely upon the administrative insolvency of this case. Further, as a final and equitable fee award, this Court will allow SZD the fees and expenses already paid, but deny any further payment of fees and expenses from the bankruptcy estate. *This Court does not consider herein the propriety of the final fee and expense application of any professional except that of SZD.*

**FACTS**

The Debtor in this case, Unitcast, Inc., was a manufacturer of cast steel products for use in a number of industries, such as frames for railway cars. As of November of 1992, it was owned by a corporation owned by William Cook, PLC, which was the largest manufacturer of steel castings in Europe. About this time, Unitcast was having financial difficulties, and Unitcast management expressed interest in purchasing the foundry. In December of 1992, Unitcast was purchased for Ten Dollars ($10.00) and the assumption of liabilities by a corporation whose only shareholders were three members of the management of Unitcast.

According to the Debtor's Third Amended Disclosure Statement, at the time of the purchase Unitcast was suffering substantial losses due to such factors as high employment costs under the existing collective bargaining agreement, an underfunded pension plan, on-going liability for its employee and retire-

ment coverage, a landfill site that needed to be closed, and increasing numbers of creditor suits. Also, the machinery used at the foundry was outdated and in need of repair. On May 3, 1993, Unitcast filed for Chapter 11 bankruptcy protection.

Unitcast operated as a Debtor–In–Possession until May 15, 1995, when a Chapter 11 Trustee was appointed. Prior to the time of the appointment of the Chapter 11 Trustee, extensive negotiations had resulted in a Disclosure Statement and Plan, whereby it was contemplated that the assets of Unitcast would be purchased by a corporation to be formed and owned by William Lott, who was the major secured creditor in the bankruptcy case, and whose secured claim totaled Six Hundred and Fifty Thousand Dollars ($650,-000.00) in principal amount by the end of the case.[1] Though the "purchase price" under the terms of the Third Amended Plan of Reorganization was ostensibly around Five Million Dollars ($5,000,000.00), the actual cash infusion would have been much less, especially considering that most of the initial payment would go to pay Mr. Lott's own secured claim. Indeed, the unsecured creditors would receive only five percent (5%) of their claims, or approximately Two Hundred Fourteen Thousand Dollars ($214,000.00).

The Third Amended Disclosure Statement, filed February 24, 1995, stated that the estimated market value of the assets was Four Million Six Hundred Forty-eight Thousand Four Hundred Forty-nine Dollars ($4,648,-449.00), and the estimated liquidation value of the assets was Two Million Four Hundred Fifty-three Thousand Two Hundred Seventy-five Dollars ($2,453,275.00).[2] However, the business ultimately sold for only Eight Hundred and Fifty Thousand Dollars ($850,-000.00), apparently due in part to environmental problems at the foundry site which

---

1. Lott also incurred compensable attorney's fees, and his secured position grew to what was considered to be approximately Seven Hundred and Fifty Thousand Dollars ($750,000.00) at the time the business was sold.

2. The original Disclosure Statement, filed November 30, 1993, stated that the market value was Five Million Seven Hundred Thirty-nine Thousand Six Hundred Ninety-nine Dollars ($5,739,699.00) and the liquidation value was

Three Million One Hundred Eight Thousand Two Hundred Seventy-five Dollars ($3,108,275.00). The Second Amended Disclosure Statement, filed May 25, 1994, stated that the estimated market value was Four Million Six Hundred Forty-eight Thousand Four Hundred Forty-nine Dollars ($4,648,449.00), and the estimated market value was Two Million Six Hundred Eight Thousand Two Hundred Seventy-five Dollars ($2,608,-275.00).

were found as the result of due diligence performed by the ultimate purchaser, who was not Mr. Lott.

At a Hearing on the Third Amended Disclosure Statement on March 22, 1995, the Court inquired about a Mutual Release entered into postpetition between the Debtor and William Cook, PLC, which was disclosed in the Third Amended Disclosure Statement but had not been approved by the Court. This precipitated a Rule 2004 examination of the president and business consultant of the Debtor. Events discovered in the Rule 2004 examination in turn precipitated a Motion by the United States Trustee for the Appointment of a Chapter 11 Trustee, which was subsequently granted.

Shortly after the appointment of the Chapter 11 Trustee, another potential purchaser of the Debtor became known. A Hearing was scheduled so that Unitcast could be auctioned to the highest bidder. At the beginning of the Hearing, Mr. Lott appeared prepared to bid, but during the Hearing Mr. Lott apparently then learned of environmental problems at the foundry, and withdrew his offer. The business was then sold for Eight Hundred and Fifty Thousand Dollars ($850,000.00) to another purchaser. The Toledo foundry was not purchased, however, due to the environmental problems with the real estate. The foundry was subsequently sold for Five Thousand Dollars ($5,000.00) to another purchaser for non-foundry purposes.

During the pendency of the Chapter 11 proceedings, SZD filed three interim fee applications. After appointment of the Chapter 11 Trustee and the conversion of this case to Chapter 7, SZD filed their Fourth and Final Application for Allowance of Compensation and Reimbursement of Expenses of Counsel

for Debtor–in–Possession. Thus, this Court must consider the SZD's Fourth Application for interim fees and expenses, and then consider the Final Application for their first through fourth interim fee and expense awards.

In its Fourth Interim Application, SZD requests that it be allowed compensation for services rendered in the amount of Two Hundred Twenty-five Thousand Four Hundred Thirty-eight and 60/100 Dollars ($225,438.60), and reimbursement of expenses in the amount often Thousand Four Hundred Nineteen and 05/100 Dollars ($10,419.05). Previously, this Court has ruled on the first three applications that it will not allow SZD compensation for the preparation of fee applications. SZD again included these fees in its application, which total thirty-five and 10/100 hours (35.1) attorney hours and which correspond to charges of Three Thousand Four Hundred Seventy Nine Dollars ($3,479.00) at the various hourly rates. Considering the particular facts of this case, this Court also finds that fees relating to the United States Trustee's Motion to Review and Disgorge, which total seven and 10/100 (7.1) hours and which correspond to charges of One Thousand Two Hundred Seventy-five and 20/100 Dollars ($1,275.20) at the various hourly rates, should not be allowed. Accordingly, SZD's Fourth Interim Application should be reduced by Four Thousand Seven Hundred Fifty-four and 20/100 Dollars ($4,754.20), to Two Hundred Twenty Thousand Six Hundred Eighty-four and 40/100 Dollars ($220,-684.40).

The details for the allowed interim fee and expense applications, including the Fourth at issue herein, are as follows:

| Date Filed | Period Covered | Requested Fees/Expenses | Allowed Fees/Expenses |
|---|---|---|---|
| 9/17/93 | 04/28/93—08/31/93 | $104,809.72/$7,928.23 | $102,482.22/$7,928.23 |
| 1/24/94 | 09/01/93—12/31/93 | 84,256.90/6358.16 | 79,135.00/6,358.16 |
| 11/17/94 | 01/01/94—09/30/94 | 269,737.70/13,116.61 | 268,178.70/13,116.61 |
| 09/21/95 | 10/01/94—05/16/95 | 225,438.60/10,419.05 | 220,684.40/10,419.05 |

The total amount of allowed interim fees is Six Hundred Seventy Thousand Four Hundred Eighty and 32/100 Dollars ($670,480.32), and the total amount of allowed interim expenses is Thirty-seven Thousand Eight Hundred Twenty-two and 05/100 Dollars ($37,-822.05), bringing the total to Seven Hundred Eight Thousand Three Hundred Two and 37/100 Dollars ($708,302.37). According to

SZD's Fourth and Final Application, it has been paid to date Five Hundred Four Thousand One Hundred Seventy-six and 93/100 Dollars ($504,176.93).

## LAW

The Bankruptcy Code, 11 U.S.C. § 101 et seq., provides in pertinent part:

### 11 U.S.C. § 327. Employment of professional persons

(a) Except as otherwise provided in this section, the trustee, with the court's approval, may employ one or more attorneys, accountants, appraisers, auctioneers, or other professional persons, that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the trustee in carrying out the trustee's duties under this title.

(c) In a case under chapter 7, 12, or 11 of this title, a person is not disqualified for employment under this section solely because of such person's employment by or representation of a creditor, unless there if objection by another creditor or the United States trustee, in which case the court shall disapprove such employment if there is an actual conflict of interest.

### 11 U.S.C. § 328. Limitation on compensation of professional persons

(c) Except as provided in section 327(c), 327(e), or 1107(b) of this title, the court may deny allowance of compensation for services and reimbursement of expenses of a professional person employed under section 327 or 1103 of this title if, at any time during such professional person's employment under section 327 or 1103 of this title, such professional person is not a disinterested person, or represents or holds an interest adverse to the interest of the estate with respect to the matter on which such professional person is employed.

### 11 U.S.C. § 329. Debtor's transactions with attorneys

(a) Any attorney representing a debtor in a case under this title, or in connection with such a case, whether or not such attorney applies for compensation under this title, shall file with the court a statement of the compensation paid or agreed to be paid, if such payment or agreement was made after one year before the date of the filling of the petition, for services rendered or to be rendered in contemplation of or in connection with the case by such attorney, and the source of such compensation.

### 11 U.S.C. § 330. Compensation of officers

(a) After notice to any parties in interest and to the United States trustee and a hearing, and subject to section 326, 328, and 329 of this title, the court may award to a trustee, to an examiner, to a professional person employed under section 327 or 1103 of this title, or to the debtor's attorney—

> (1) reasonable compensation for actual, necessary services rendered by such trustee, examiner, professional person, or attorney, as the case may be, and by any paraprofessional persons employed by such trustee, professional person, or attorney, as the case may be, based on the nature, the extent, and the value of such services, and the cost of comparable services other that in a case under this title; and
>
> (2) reimbursement for actual, necessary expenses.

The Bankruptcy Reform Act of 1994 rewrote this § 330 as follows:

### 11 U.S.C. § 330. Compensation of officers

(a)(1) After notice to the parties in interest and the United States Trustee and a hearing, and subject to sections 326, 328, and 329, the court may award to a trustee, an examiner, a professional person employed under section 327 or 1103–

> (A) reasonable compensation for actual, necessary services rendered by the trustee, examiner, professional person, or attorney and by any paraprofessional person employed by such person; and
>
> (B) reimbursement for actual, necessary expenses.

(2) The court may, on its own motion or on the motion of the United States Trustee, the United Stated Trustee for the District or Region, the trustee for the estate, or

any other party in interest, award compensation that is less than the amount of compensation that is requested.

(3)(A) In determining the amount of reasonable compensation to be awarded, the court shall consider the nature, the extent, and the value of such services, taking into account all relevant factors, including-

(A)(sic) the time spent on such services;

(B) the rates charged for such services;

(C) **whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title;**

(D) whether the services were performed within a reasonable time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed; and

(E) whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other that cases under this title.

(4)(A) **Except as provided in subsection (b), the court shall not allow compensation for-**

(i) **unnecessary duplication of services; or**

(ii) **services that were not-**

(I) **reasonably likely to benefit the debtor's estate; or**

(II) **necessary to the administration of the case.**

(B) In a chapter 12 or chapter 13 case in which the debtor is an individual, the court may allow reasonable compensation to the debtor's attorney for representing the interest of the debtor in connection with the bankruptcy case based on a consideration of the benefit and necessity of such services to the debtor and the other factors set forth in this section.

(5) The court shall reduce the amount of compensation awarded under this section by the amount of any interim compensation awarded under section 331, and, of the amount of such interim compensation exceeds the amount of compensation awarded under this section, may order the return of the excess to the estate.

(6) Any compensation awarded for the preparation of a fee application shall be based on the level and skill reasonably required to prepare the application. (Emphasis added.)

## 11 U.S.C. § 331. Interim Compensation

A trustee, an examiner, a debtor's attorney, or any professional person employed under section 327 or 1103 of this title may apply to the court not more than once every 120 days after an order for relief in a case under this title, or more often if the court permits, for such compensation for services rendered before the date of such an application or reimbursement for expenses incurred before such date as is provided under section 330 of this title. After notice and hearing, the court may allow and disburse to such applicant such compensation or reimbursement.

## 11 U.S.C. § 503. Allowance of administrative expenses

(a) An entity may file a request for payment of administrative expense.

(b) After notice and a hearing, there shall be allowed administrative expenses, other than claims allowed under section 502(f) if this title, including—

(1)(A) the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case;

(B) any tax—

(i) incurred by the estate, except a tax of a kind specified in section 507(a)(7) of this title; or

(ii) attributable to an excessive allowance of a tentative carryback adjustment that the estate received, whether the taxable year to which such adjustment relates ended before or after the commencement of the case; and

(C) any fine, penalty, or reduction in credit relating to a tax of a kind specified in subparagraph (B) of this paragraph[.]

## 11 U.S.C. § 507. Priorities

(a) The following expenses and claims have priority in the following order:

(1) First, administrative expenses allowed under § 503(b) of this title, and any fees and charges assessed against the estate under chapter 123 of title 28 [28 U.S.C. §§ 1911 et seq.].

**11 U.S.C. § 726 Distribution of the property of the estate**

(a) Except as provided in section 510 of this title, property of the estate shall be distributed—

(1) first, in payment of claims of the kind specified in, and in the order specified in, section 507 of this title:

(b) Payment on claims of a kind specified in paragraph (1), (2), (3), (4), (5), (6), or (7) of section 507(a) of this title, or in paragraph (2), (3), (4), or (5) of subsection (a) of this section, shall be made pro rata among claims of the kind specified in each such particular paragraph, except that in a case that has been converted to this chapter under section 1112, 1208, or 1307 of this title, a claim allowed under section 503(b) of this title under this chapter after such conversion has priority over a claim allowed under section 503(b) of this title incurred under any other chapter of this title or under this chapter before such conversion and over any expenses of a custodian superseded under section 543 of this title.

**11 U.S.C. § 1112. Conversion or dismissal**

(b) Except as provided in subsection (c) of this section, on request of a party in interest or the United States trustee or bankruptcy administrator, and after notice and a hearing, the court may convert a case under this chapter to a case under chapter 7 of this title or may dismiss a case under this chapter, whichever is in the best interest of creditors and the estate, for cause, including—

(1) continuing loss to or diminution of the estate and absence of a reasonable likelihood of rehabilitation;

(2) inability to effectuate a plan;

(3) unreasonable delay by the debtor that is prejudicial to creditors;

(4) failure to propose a plan under section 1121 of this title within any time fixed by the court;

(5) denial of confirmation of every proposed plan and denial of a request made for additional time for filing another plan or modification of a plan;

(6) revocation of an order of confirmation under section 1144 of this title, and denial of confirmation of another plan or a modified plan under section 1129 of this title;

(7) inability to effectuate substantial consummation of a confirmed plan;

(8) material default by the debtor with respect to a confirmed plan;

(9) termination of a plan by reason of the occurrence of a condition specified in the plan; or

(10) nonpayment of any fees or charges required under chapter 123 of title 28 [28 USC §§ 1911 et seq.]

### DISCUSSION

Determinations concerning the administration of the estate are core proceedings pursuant to 28 U.S.C. § 157. Thus, this case is a core proceeding.

The UST's Request for Court Determination as to Manner in which Funds Should be Distributed and Interest Upon Funds Disgorged presents issues initially raised by the IRS its Motion for Accounting, Disgorgement and Payment of United States' Post–Petition Tax Claim. This Court denied the IRS's Motion because it had not shown it was entitled to the proceeds of a disgorgement and redistribution of professional fees. This Court concluded that because it had not been made aware of the final amount of the administrative expense claims that remain to be paid, it was premature to reach the disgorgement issue. Because it now appears that the issues involving the claim of the IRS and other creditors will not be settled for some time, this Court will now rule on the UST's Request based on the likely assumption that there will be little funds available to pay a large amount of administrative expense claims. Thus, many professionals would be forced to disgorge a portion of their fees

previously paid to them were this Court to order them to do so to effectuate a pro rata distribution among administrative expense creditors. Because this Court finds that this issue is related to the issues involved in SZD's final fee applications, this Court will also rule on this issue as well.

### I.

The issue to be resolved upon the UST's Request is whether this Court should adopt the rule already adopted by other courts that interim professional fees paid during a Chapter 11 case which is subsequently converted to a Chapter 7 case should be disgorged to effectuate a pro rata distribution among administrative expense creditors when there are insufficient assets in the Chapter 7 case to pay all Chapter 11 administrative expenses after the Chapter 7 administrative expenses have been paid. This Court does not believe that Congress intended disgorgement of professional's fees due only to administrative insolvency. Further, this Court finds such disgorgement would harm rather than further the goals of the Bankruptcy Code.

Cases from other jurisdictions have addressed the issue of disgorgement of professional fees upon the administrative insolvency of a bankruptcy case, and held that professionals should be ordered to disgorge previously paid fees and expenses to so that a redistribution can occur whereby all administrative creditors will receive a pro rata distribution. See *In re Kearing,* 170 B.R. 1 (Bankr.D.Dist.Col.1994); *In re Lochmiller Industries, Inc.,* 178 B.R. 241 (Bankr.

S.D.Cal.1995). See also *In re Vernon Sand & Gravel, Inc.,* 109 B.R. 255 (Bankr. N.D.Ohio 1989)[3]; *In re Metropolitan Elec. Supply Corp.,* 185 B.R. 505 (Bankr.E.D.Va. 1995); *In re Kingston Turf Farms, Inc.,* 176 B.R. 308 (Bankr.D.R.I.1995).[4] While the reasoning in these cases is appealing at first blush, it loses its appeal upon closer scrutiny. This Court declines to follow them. Rather, this Court will follow what it believes to be the plain language and intent of the Code and the overriding policy arguments against such a rule.

The cases which support disgorgement of interim fees paid to professionals due to the administrative insolvency of a Chapter 11 case which was subsequently converted to a Chapter 7 case, in order to effectuate a pro rata distribution among Chapter 11 administrative expense creditors, base their conclusions upon three premises. First, they look to the language of § 726(b), which provides that claims of a same priority, such as administrative expense claims, should receive a pro rata distribution. They argue that ordering disgorgement is necessary to fulfil the § 727(b) mandate for a pro rata distribution to similarly situated creditors. Second, they argue that under § 331 the fees paid to professionals during a bankruptcy case are "interim" fees, and are therefore property of the estate, or are at least recoverable to allow for a more equitable distribution to administrative expense creditors. Third, they note the inherent unfairness in an unequal distribution to similarly situated creditors. Thus, they argue that under the

---

**3.** It should be noted that though the Court in *Vernon Sand* ostensibly adopted the rule that professionals should disgorge previously paid fees to effectuate a pro rata distribution, the Court nevertheless exercised its discretion to not order the professional in that case to disgorge fees already paid. and rather only denied payment of fee applications outstanding. 109 B.R. at 259. *In re Anolik,* 207 B.R. 34, 39 (Bankr. D.Mass.1997) followed *Vernon* as well as *In re Boston Shipyard Corp.,* 1993 WL 370629 (D.Mass. Sept. 13, 1993) and *North Bay Tractor, Inc.,* 191 B.R. 186, 188 (Bankr.N.D.Cal.1996) in holding that ordering disgorgement of fees is a discretionary matter, and explained that disgorgement is a harsh remedy that should be applied only when mandated by the equities of the case.

**4.** In *Metropolitan* and *Kingston* the Courts were faced with a situation where the payments made to the professions were made after conversion to Chapter 7 by the Chapter 7 trustee before it was discovered that there would be insufficient funds to pay all Chapter 11 administrative expenses in full. This Court agrees with the outcome in those cases because these payments were not made during the postpetition debtor's operations where a professional's ongoing reliance on such payments was necessary for the continued reorganization attempt of the debtor. However, this Court would have ordered these fees returned because of the mistaken distribution by the trustee, not under the proposed rule at issue in this case.

Court's broad equitable powers under § 105(a), this unfairness should not be allowed.

To the contrary, this Court concludes: (1) that the language of the Code does not provide for disgorgement of monies paid for administrative expenses, but rather contemplates only a pro rata payment based upon the unpaid portion of all the administrative expenses; (2) that the language and intent of the Code shows that interim fees were not intended to be recoverable due only to administrative insolvency; and (3) that the policies which underlie the Bankruptcy Code weigh heavily in favor of not allowing for the disgorgement of interim fees when the basis of such disgorgement is not the merits of the fee applications, but the insolvency of the bankruptcy case. The reasons for these conclusions are as discussed infra.

■ In pertinent part, § 726(b) provides that, "[p]ayment on claims of a kind specified in [§ 507(a)(1), which in turn references § 503(b) administrative expenses] shall be made pro rata among claims of the kinds in [§ 507(a)(1) ]." This section can be interpreted in two ways: (1) at the time of distribution, administrative expense claims are to be paid on a pro rata basis considering both the paid and unpaid portion of the administrative expense claims, or (2) at the time of distribution administrative expense claims are to be paid on a pro rata basis, considering only the unpaid portion of the administrative expenses. For the reasons that follow, this Court believes that from the language and intent of the Code, the proper interpretation must be the latter.

### Disgorgement of Expenses Paid During the Course of a Chapter 11 Case in Order to Effectuate a Pro Rata Distribution Was Not Contemplated by Congress

When Congress wrote the Bankruptcy Code it understood that some administrative expense creditors would be paid more than others during the course of a bankruptcy case. It cannot be argued that as a general rule only those postpetition creditors whose payment was necessary to preserve assets of the estate were to be paid. For example, a payment to repair a freezer which contains valuable frozen inventory should be made, as long as the value that can be obtained from the preserved inventory is larger than the repair bill. It was not, and should not be, contemplated that this creditor would have to return the payment if other administrative creditors could not be paid in full from the remaining assets of the case. Similarly, consider a trade debt in a Chapter 11 case that has been paid 100% when the case becomes administratively insolvent. No one would argue that this creditor should be forced to repay the sums paid to it, even though other creditors entitled to administrative expense status may have been paid nothing. No such redistribution was contemplated by Congress. Disgorgement and redistribution is a judicial concept that has to do only with professional's fees, and it is really punishment of the professionals for allowing the case to continue too long and presumably causing the assets to be drained. Thus, this disgorgement upon insolvency doctrine is really intended to operate either as a sanction, or as a way to equitably subordinate the professionals' claims to other less culpable creditors. However, both of these purposes are already provided for in the Code, per sections 330 and 510 respectively.

### There is Nothing in § 726 Which Provides for Disgorgement of Interim Fees

Section 726(b) provides for the pro rata payment of "claims." "Claim" is defined in § 101(5) as a "right to payment." Section 726 is clearly intended to operate at or near the end of a case, so it could be inferred that only the "rights to payment" which exist at the end of the case are to be accorded a pro rata distribution. Indeed, no one would consider that administrative expenses that have already been paid should be paid again. Rather, § 726 is intended to prescribe how the assets on hand at the end of the case are to be divided among the remaining creditors. While this Court does not believe that the language of § 726 is conclusive of the matter, it does show that it was clearly not mandated in the writing of § 726 that a professional's fees, or anyone else's, would be disgorged for a pro rata distribution. Rather, the Courts which have ordered such disgorgement have done so under § 105. Thus, this Court will

focus on the result of such a judicially created rule.

***The Purpose Behind "Interim" Fee Awards is Not Disgorgement For a Pro Rata Distribution, But to Provide an Enforcement Mechanism for the § 330 Limitations on Compensation***

 The policy behind allowing "interim" compensation to professionals employed under § 327 is to provide for a compromise between the § 330 policy that a professional has properly earned the fees and has not taken advantage of the bankruptcy process, and the policy of allowing professionals to be paid at least timely enough that they can reasonably undertake the case. That is, because many of the factors to be considered in a § 330 fee award may not come to light until after such time as a professional would require compensation to be able to fund his or her own operations, the § 331 mechanism was developed to provide for both goals. Thus, a professional can be paid on a fairly timely basis, and reasonably expect to be able to retain those fees as long as he or she has not acted in the manner proscribed by § 330, which in turn incorporates sections 326, 327, 328, and 329 (the professional employment and compensation provisions of the Bankruptcy Code). There is no reference in any of these provisions to § 726.

 The policy behind allowing interim compensation to professionals is like that of paying any administrative expense claim. That is, payment is made because the Code presumes that doing so will maximize the value of the assets of the bankruptcy estate. A successful Chapter 11 case will do just that, by not losing the going concern value of the business. If allowing the debtor-in-possession to operate does not preserve the assets for creditors, or at least is not reasonably likely to do so, then the case should be converted to Chapter 7 and liquidated. The Code provides for just that, in § 1112. The professional's fees are "interim," not so that the professional will insure the administrative solvency of the case, but so that the Court may be able to judge the propriety of

the fees under § 330 with facts that may come to light after the payments are rendered.[5]

***If a Professional Has Improperly Caused a Chapter 11 Case to Continue Too Long, Thereby Wasting Assets of the Bankruptcy Estate, the Code Provides Remedies Which Limit Compensation***

It is undisputable that under § 330 a Court can consider the likelihood of benefit to the estate of services when performed. *In re Allied Computer Repair, Inc.*, 202 B.R. 877, 885–889 (Bankr.W.D.Ky.1996). Further, by providing that the Court can review interim payments already made to a professional, the Court can consider evidence that was not available to it earlier, which can further shed light on whether the professional knew or should have known that the services provided would be reasonably likely to benefit the estate. As a practical matter, this Court believes that whether the professional has fulfilled fiduciary duties by having discovered and disclosed all relevant facts to the Court and creditors will be probative to this determination. When a Court orders disgorgement based solely upon the administrative insolvency of the case, it sets aside these provisions of the Code, and avoids the uncomfortable job of telling the professional that the services rendered were not worthy of the compensation being requested. While this may be convenient, it is not the method contemplated by the Code.

***Disgorgement Based Solely Upon Administrative Insolvency Exposes Bankruptcy Professionals to Too Much Risk, and Will Thereby Increase the Costs of Bankruptcy Reorganization in Contravention of the Purposes of the Bankruptcy Code***

Under normal business conditions, any business which does not demand payment before providing goods or services bears the risk of insolvency of its customer or client. This is a normal business risk. Payment is the mechanism, under normal business conditions, which cuts short this risk. If professionals are forced to disgorge fees that they

---

**5.** The Bankruptcy Reform Act of 1994's addition of § 330(a)(4)(A), though not directly applicable to this case, expressly emphasizes that the court

"shall not allow compensation for.. services that were not ... reasonably likely to benefit the debtor's estate."

have already been paid, based not upon any culpability on their part, but only upon the administrative insolvency of the case, they are no longer provided the mechanism which normally cuts short the risk of nonpayment. That is, payment no longer alleviates the problem of nonpayment. By providing for such disgorgement, the courts are cutting short the normal risk to all the non-professional administrative creditors (and only to the extent professionals can pay what is ordered), and creating an abnormal risk to the professionals employed in the bankruptcy case by denying the repose payment normally provides. Though professionals should justifiably know and expect that they would have to disgorge fees that are subsequently found to be unearned or unjustified under the § 330 criteria, it is only the § 330 criteria that the Code envisions they should have to fear. Because professionals are in a position to control the propriety of their own actions, they are in a position to minimize the risk of misfeasance or malfeasance just as the Code wants them to do. Thus, this risk will not cause a significant increase in a professional's demand for compensation when deciding to undertake a bankruptcy case or practice bankruptcy law.

On the other hand, the risk of a Chapter 11 case's administrative insolvency, when not tied to the professional's conduct, is much greater and would cause professionals to demand greater compensation. Such a situation could have the effect of causing smaller firms to decline such cases because they could not survive the potential disgorgement. Indeed, this would be strict liability. A professional will not always be in a position to judge the potential or continuing administrative solvency of a case. This is certainly true of professionals who are not bankruptcy experts, though it is also true for those who are. Administrative expense status issues can be hotly contested and decisive in a large bankruptcy case, with very large sums at stake. The present case is a good example. Creditors like the PBGC, the IRS, the Ohio Bureau of Workers Compensation, the Ohio

Bureau of Employment Services, arid the Ohio Environmental Protection Agency all alleged administrative expense status for some or all of their large claims. The propriety of such a claim can be significantly complex both legally and factually. Allowing disgorgement based only upon the administrative insolvency of a bankruptcy case could also force professionals to cave into these demands rather than fight what are often unjustified administrative expense claims. Further, litigation of these claims, if appealed, could continue for some time, and professionals would justifiably have to fear that interim fees received during this time could be jeopardized were they to lose.

Also, as in this case, administrative expenses can arise quite unexpectedly, such as an environmental problem of an unexpected magnitude. Further, the business could suffer an unexpected loss of value, such as a fire or other loss of going concern value. Also, business conditions can be very unpredictable for both the ability of the debtor to continue, or for the valuation of the debtor's assets. These risks are too great to force a professional to insure the case's administrative solvency not only with fees that have not been paid, but with fees that have been paid some time ago.

■ This is why the Code rightly contains an element of misconduct or culpability before disgorgement is warranted. Under § 330, it will clearly be relevant whether the results obtained in a case justify the fees requested, but the focus also considers whether the professionals were justified in providing these fees creating this administrative expense.[6] Such factors as whether professionals made all information they knew or should have known available so that creditors and the Court could make informed decisions as to whether the case should continue can clearly be weighed. Further, it is the professional's burden to prove the propriety of the compensation requested. This is what the Code does contemplate. Fees are "interim" so that a retroactive § 330 analysis can be

6. The 1994 Bankruptcy Reform Act amendment to § 330 makes it clear that the Court should consider, "whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title." 11 U.S.C. § 330(a)(3)(C).

undertaken. Section 331 has nothing to do with § 726(b), which itself nowhere calls for disgorgement of interim fees.

### Bankruptcy Policy Does Not Seek to Correct the Perceived Unfairness that Some Creditors Get Paid While Others Do Not, Absent an Element of Unfairness

As stated supra, in the normal business world every provider of goods and services who does not demand payment up front bears the risk that its customer will not or cannot pay the bill when due. The Bankruptcy Code realizes that when a bankruptcy petition is filed some creditors, otherwise similarly situated, will have received payments while others will not. The Bankruptcy Code does not necessarily seek to equalize this treatment or undermine the repose payment normally brings absent an element of unfairness beyond the mere fact that some were paid while others were not. That is, though the Code seeks to treat similarly situated creditors similarly, it understands that paid creditors are not similarly situated to unpaid creditors. Unless a creditor was paid with an element of unfairness, such as preferentially or fraudulently, a creditor will retain the repose payment normally brings. The Code does not seek to alleviate the "unfairness" with regard to prepetition claims, and this Court can see no justification as to why the Code does, should, or would seek to alleviate this unfairness with regard to postpetition claims.

In a bankruptcy case, the premise is that it should be administered by the trustee or debtor-in-possession to maximize the value of the estate for the debtor's creditors. Expenses, including professional fees, are paid to accomplish this goal. If the expenses are not justifiably likely to accomplish this goal, they should not be incurred and the case should be converted per § 1112. (Again, § 331 and § 330 provide for a retroactive review of professional fees to insure the professionals properly conducted themselves in accordance with their duties.) Just as prepetition creditors seek payment to cut short the risk of nonpayment, postpetition creditors also seek payment to cut short the risk that the client, the postpetition debtor, will

no longer be able to pay. The Code wisely provides for this, so that the necessary goods and services will be provided. Creditors who need to be paid get paid, and creditors who do not need to be paid on an ongoing basis to preserve the assets of the estate bear the risk of administrative insolvency. They do have the option, however, to call for an end to the payment of these ongoing expenses and to have the assets presently liquidated. Further, the Court is also called upon to approve all postpetition expenditures not in the ordinary course of the debtor's business. Considering this scheme, it can only be concluded that the fact that some postpetition creditors get paid more than others is not an unfairness the Bankruptcy Code seeks to eliminate.

### Many Professionals Are Not in a Position to Control or Oversee the Chapter 11 Case, But Still Would and Should be Professionals Employed Under Section § 327

The driving policy consideration behind making professionals disgorge fees upon the administrative insolvency of a case is that the professionals employed under § 327 are in a position to control or have knowledge of the debtor-in-possession's ability to successfully reorganize. See Vernon Sand, 109 B.R. at 258–259, following and quoting In re Pacific Forest Ind., Inc., 95 B.R. 740, 743 (Bankr. C.D.Cal.1989). This is not true of many professionals that are and should be employed under § 327. In the case at bar, some professionals were employed solely for the purpose of dealing with pension plan liabilities, others for workers compensation liabilities, and yet others for environmental problems at the debtor's landfill. The cost of these professionals can be very high, and the reasons for their employment could be precipitated by the bankruptcy filing. These professionals were required to comply with § 327 and § 330 so the Court and creditors could review the reasonableness of their fees, which is the purpose of these professional compensation provisions of the Bankruptcy Code. They were not, however, in a position to control the debtor's activities, nor were they or should they have been privy to special knowledge which would give rise to a fiduciary duty to determine the reasonableness of the continuation of the bankruptcy reorgani-

zation attempt. Under the disgorgement based upon administrative insolvency doctrine, however, the fees paid to them would be subject to disgorgement because they were recoverable by the Court and are therefore estate property.

### The Bankruptcy Estate Does Not Have a Property Interest in Interim Fees Which Arises as a Result of the Administrative Insolvency of the Case

The Courts which have ordered the disgorgement of professional fees based on administrative insolvency have done so on the apparent assumption that because interim fees are subject to disgorgement per § 331 and § 330, these fees must remain property of the estate and therefore be used in the calculation for a pro rata distribution. See *In re Metropolitan Elec. Supply*, 185 B.R. at 508 ("[P]ayments made by the Trustee that are subject to disgorgement must be property of the estate. Otherwise, disgorgement could never occur.") This is an interesting view of property law. It is this Court's understanding that property can be transferred subject to conditions, and the transferor holds only a conditional property interest which will not give rise to possessory or beneficial interest unless the conditions come into existence. In this case, the condition is clearly that the Court will not order disgorgement based on the § 330 criteria, not that the case will be become administratively insolvent. Similarly, if the payment of fees is viewed under contract law, there would be no term in the § 331, § 330 employment contract which would call for the return of fees based solely upon the case's subsequent insolvency.

### By Making Professionals Continuing and Increasingly Liable for Interim Fees Paid, Professionals Become Increasingly Less Disinterested in Contravention of an Express Purpose of the Bankruptcy Code

Though it cannot be argued that a professional becomes a creditor of the estate every time services are performed for which payment has not been made, and that once paid the professional becomes a potential debtor to the estate to the extent the client could seek return of the fees if those fees were not earned, such a situation is at least a customary circumstance of a professional/client relationship. While the Bankruptcy Code greatly increases the chances and ease that a professional may be forced to return unearned fees, such a circumstance is at least based on the traditional professional/client relationship notion that one should only get paid for what one has earned. Providing that a professional may be ordered to disgorge fees not for shortcomings in services rendered, but for circumstances legally tied to the debtor's financial success or failure, is a bond of a different kind altogether. This Court would be reluctant to employ a professional who owed a significant contingent debt to the bankruptcy debtor, as such a professional would at least arguably not be employable per § 327. It countermands this policy of disinterestedness to have the Bankruptcy Code itself interpreted in such a way as to create such a link, where the professional's interest may or may not be directly in line with the creditors in the case. Such a professional may be in a position where his or her own interest would be best served by risking a continued reorganization attempt with what could be, in effect, the creditor's assets. Alternatively, such a professional may be in a position not to risk a continued reorganization attempt which may in fact be in the best interests of other creditors, particularly general unsecured creditors.

### The Calculation Contemplated per § 726(b) is One that Only Considers the Unpaid Portion of the Administrative Expense, Not Both the Paid and Unpaid Portions

It seems odd to this Court that § 726 would be interpreted so as to require the Chapter 7 trustee to go back and not only review the unpaid portion of the various administrative expenses, but the paid portion as well. This would be necessary if the calculation to be used for a pro rata distribution of § 507(a)(1) claims were ordered based using the entire expense, both paid and unpaid portions, to calculate each creditor's pro rata share. All postpetition taxes, trade debts, and other expenses would have to be reviewed. Further, questions would arise as to whether the same creditor could have separate claims that could yield different payments depending on the relative amounts and

payments already made on these expenses. Would the Ohio Bureau of Worker's Compensation be a separate claim from the Ohio Bureau of Employment Services or the Ohio Environmental Protection Agency? Would the IRS have separate claims for payroll taxes, payroll tax penalties, and other taxes and other penalties? Would a trade creditor who worked on two separate and distinct projects have two claims or one? Would two creditors who are owned by the same parent company be one creditor, even if the debtor negotiated with the principals of the parent company? Would the amounts paid to trade creditors in full be used in this calculation? It is clearly beyond the contemplated purposes of § 726(b) that such policy determinations would have to be made. Congress thought it was a simple matter, just calculate the pro rata share based upon the claims, that is, the rights to payment, which still exist at the time of distribution.

The UST urges this Court to adopt the formula articulated in *Metropolitan Elec. Supply*, 185 B.R. at 512, which declines to consistently consider either the whole amount of the administrative expense, or just the unpaid portion. Only the unpaid portion of the nonprofessional administrative expenses are considered in calculating these creditors' pro rata shares, while professional administrative expenses are treated as if no payments had ever been made to these creditors throughout the entire case.[7]

The consequences of such a formula could be drastic. Consider a case such as the one at bar, where there could be millions of dollars of unpaid post-petition "taxes" and penalties owed to government entities,[8] and under the *Metropolitan Elec. Supply* formula these creditors would be deemed to have already received nothing on their claims no matter how much they received during the

Chapter 11 case. By so diluting the total claim base, professionals could have to disgorge the majority of the fees they earned over the last two years. Such a severe result would have the effect of persuading professionals who are not in a position to be able to withstand such a loss from ever working for debtors in large business cases with substantial liabilities. Though they may have properly earned the fees for services properly rendered (as determined under § 330), they would have to disgorge these monies from their personal accounts. Interim fees are paid to fund the professional's operations, so it is contemplated that they would spend the monies paid to them accordingly, relying on the fact that they are only subject to disgorgement under the § 330 criteria. Where such a harsh result really contemplated, it would have been expressly written in the Code.

Consider a case where professionals were paid 80% of the One Hundred Thousand Dollars ($100,000) in fees they earned over a year, and where there are Two Hundred Thousand Dollars ($200,000) in unpaid nonprofessional administrative expenses. Under the *Metropolitan Elec. Supply* formula, the professionals would have to disgorge such an amount so as to reduce their pro rata share from 80% to 33%. That is, they would be forced to disgorge approximately Forty-six Thousand Dollars ($46,000) of the Eighty Thousand Dollars ($80,000) they had been paid over those two years to fund their operations. Such a result is clearly not contemplated by the Code, and could have the effect of bankrupting unwitting professionals, or dissuading wary and qualified professionals from representing the debtor in the first place. Small firms could be driven from the market, and large ones would demand excessive compensation for taking this severe risk.

---

7. In the explanation of the formula, the *Metropolitan Elec. Supply* Court stated that the "TOTAL CLAIM BASE" would consist of the entire amount of the professionals' administrative expense claims (both the paid and paid portions) plus the "claims for unpaid administrative expenses." Though the Court did not expressly explain whether the "CLAIM AMOUNT" figure for nonprofessional administrative expense claims would include only the unpaid portion,

only a calculation based on the unpaid portion would yield a pro rata distribution.

8. Also, in some cases it appears that nongovernmental creditors could have subrogation claims to postpetition tax status. See § 507(d), which by its language could be considered to allow an entity to be subrogated to the priority rights of a postpetition tax creditor, by only expressly denying it with regard to prepetition taxes.

Such a result certainly does not further the goals of the Bankruptcy Code.

The *Metropolitan Elec. Supply* Court thought that because a professional's interim fees are reviewable, they were entirely property of the estate that can be distributed as if payment had never occurred. Because the Court thought it was a good idea to penalize professionals for the case's administrative insolvency, it adopted this distributional scheme.

■ For the reasons detailed above, this Court declines to adopt the *Metropolitan Elec. Supply* formula and will instead follow the scheme envisioned by Congress when it wrote the Code. Administrative insolvency will not be a basis for disgorgement in this case solely for the purpose of achieving a pro rata distribution based on the paid portion of professional claims. The Trustee shall distribute the property of the estate on a pro rata basis based upon only the portion of administrative expenses that have not been paid.[9] This Court will review, however, the Final Fee Application of SZD considering as a factor the case's poor result and administrative insolvency.

## II.

■ The UST has filed an Objection to the Fee Applications of SZD. Of particular concern to this Court is the UST's contention that the Court should consider the reasonableness of the interim fees awarded in light of what was ultimately accomplished. The UST cites the following cases for this proposition, with which this Court agrees. *In re Roger J. Au & Son, Inc.*, 114 B.R. 482, 486 (Bankr.N.D.Ohio 1990) (Court noted that the results obtained and benefit to the estate are factors that must be considered in ruling upon the reasonableness of fees); *In re Parke Imperial Canton, Ltd.*, 1995 WL 108718 (Bankr.N.D.Ohio) (Court denied a percentage of fees sought and stated "rewards for most efforts of professional and nonprofessionals alike bear, or should bear, some relation to the outcome of those efforts"). The UST also notes that the fact that a debtor's efforts to reorganize are ultimately unsuccessful should not itself necessarily warrant a reduction of fees, though the final outcome of the case should be a factor in reviewing the reasonableness of fees. *In re Gibbons–Grable Co.*, 141 B.R. 614 (Bankr. N.D.Ohio 1992).

■ In this case, SZD has requested the final allowance of what this Court determines to be Six Hundred Seventy Thousand Four Hundred Eighty and 32/100 Dollars ($670,-480.32) in interim fees, and Thirty-seven Thousand Eight Hundred Twenty-two and 05/100 Dollars ($37,822.05) in interim expenses, for a total of Seven Hundred Eight Thousand Three Hundred Two and 37/100 Dollars ($708,302.37). As the UST points out, the bulk of the assets of this case were ultimately sold for only Eight Hundred Fifty Thousand Dollars ($850,000.00) after the Chapter 11 Trustee was appointed. The UST has called for a twenty-five percent (25%) reduction in the fees requested.[10]

In reply, the SZD argues that the Eight Hundred Fifty Thousand Dollar ($850,000.00) sales price was negotiated by the Chapter 11 Trustee, not them, and that at the hearing on the motion to sell SZD stated that the purchase price was inadequate.[11] SZD argues that all of their services related directly or indirectly to a plan of reorganization which

---

**9.** That is, the allowed claims that exist at the time of distribution.

**10.** The UST also objected to specific time entries concerning what it alleged were improprieties on the part of SZD. In this case, this Court finds these objections without merit.

**11.** This is not precisely correct. At the beginning of the Hearing at which the debtor business was sold, SZD, via Victoria Powers, Esq., stated it would prefer the Chapter 11 to go forward due to the two years of extensive efforts put into it, and that the purchaser (William Lott) apparently continued to have a desire to do so. However, after the Ohio Environmental Protection Agency representative stated that judging from investigative report (performed by the other potential purchaser under due diligence to arrive at a cash offer) that the new owner of the foundry could be liable for foundry cleanup, which could cost between Six Hundred Thousand Dollars ($600,000.00) and Two Million Dollars ($2,000,000.00), Mr. Lott withdrew his offer altogether. Thereafter, Ms. Powers stated that she did not like the other offer (for Eight Hundred Fifty Thousand Dollars ($850,000.00) cash, with no contingencies), but it was the only one available now.

would have sold the operating assets for nearly Five Million Dollars ($5,000,000.00), and that it was unfortunate that such a plan could not proceed due to the acts of the debtor which caused the appointment of the Chapter 11 Trustee. SZD maintains that it should not be penalized for the debtor's failure to proceed.

▬▬▬ SZD points out, and this Court agrees, that confirmation of a plan is not a prerequisite to counsel's entitlement to compensation, citing *In re Prudhomme*, 152 B.R. 91 (Bankr.W.D.La.1993), aff'd 176 B.R. 781, aff'd 43 F.3d 1000; and *In re Public Service Co.*, 102 B.R. 276 (Bankr.D.N.H.1989). SZD also points out, and this Court also agrees, that a court should not adjust the lodestar amount to which debtor's counsel is entitled for services rendered in a Chapter 11 case downward because of failure of debtor's attempted reorganization where such failure was in no way due to the quality of the attorneys' services, citing *In re Chicago Lutheran Hosp. Assoc.*, 89 B.R. 719, 738 (Bankr. N.D.Ill.1988); *In re Blackwood Assoc., L.P.*, 165 B.R. 108 (Bankr.E.D.N.Y.1994); and *In re Arnold*, 162 B.R. 775 (Bankr.E.D.Mich. 1993) (mere fact that trustee did not prevail in adversary proceeding does not warrant denial or reduction in fees where attorney did a workman-like job in getting matter to trial and hourly rates were well within the market price). Finally, SZD also points out that only in extreme cases where the debtor's attorneys have expended significant time and effort on matters which had little or no chance of benefitting the debtor's estate should major reductions in fees be made based upon the results obtained, citing *In re Atwell*, 148 B.R. 483, 494 (Bankr.W.D.Ky. 1993). The issue in this case, however, is whether SZD has shown that the services it provided were of a quality and quantity that would entitle it to the compensation requested under a lodestar analysis, considering the likelihood of the result obtained and the time expended. *In re Boddy*, 950 F.2d 334, 337 (6th Cir.1991).[12] The lodestar method was thoroughly analyzed and explained in *In re Allied Computer Repair, Inc.*, 202 B.R. 877,

883–888 (Bankr.W.D.Ky.1996), which this Court hereby adopts and will follow. (*Allied* followed *Atwell*, a case cited by SZD, mentioned supra.)

▬▬▬ The Court in *Allied* explained the factors to be considered in determining lodestar amounts, as well as factors which could require a global adjustment of fees. 202 B.R. at 884. The Court also exhaustingly explored the numerous cases which have held that of the factors which bear upon a global adjustment of fees, the factor of the results obtained from the services rendered carries the greatest determinative weight. *Id.* at 885. This Court finds no reason to repeat it here, but will incorporate this lengthy analysis by reference. What this Court will repeat, because of its particular bearing on the instant case, is the following:

> Attorneys must be disabused of the erroneous notion that they are entitled to compensation as long as the time recorded was actually expended. Simply put, billable hours do not necessarily translate into compensable hours. Requesting and receiving authorization from the court to represent a debtor does not automatically guarantee the attorney that he or she will be paid from the estate for such services. As several courts have noted, the bankruptcy process in not designed principally to serve as a fund for payment of professional fees. Rather, one of its main purposes is to maximize the estate for the distribution to creditors ... The estate is not a cash cow to be milked for services rendered to the estate which have not produced a benefit commensurate with the fees sought. It must be remembered that every dollar spent on legal fees results in a dollar less that is available to the estate and its creditors.

> Accordingly, the basic test of recovery requires the applicant to demonstrate that his or her services made a beneficial contribution to the estate or to creditors. Moreover, the majority of Courts agree that the results obtained is a major factor

---

**12.** The analysis contemplated by the Court of Appeals in *Boddy* is similar to the one prescribed in the present version of § 330, after the Bank-

ruptcy Reform Act changes of 1994. This Court has also considered these factors in making its decision.

in determining whether the services at least bestowed a benefit upon the estate.

While there is not a directive mandating that counsel must achieve a result that is 100% successful in order to be awarded 100% of his or her fees, counsel for the estate does bear a fiduciary duty to the estate which requires counsel to exercise a certain degree of judgment in deciding what matter of litigation to pursue ... the attorney, in his or her fiduciary capacity, bears not only a duty to conserve the estate's net assets, but to maximize the value of the estate.

\* \* \* \* \* \*

With these concerns in mind, the overwhelming majority of Courts have recognized that a 'reasonable' attorney fee for purposes of § 330 is one that is commensurate with the potential or actual value obtained.

*Id.* at 887 (*numerous quotations and citation omitted*).[13]

This is not to say that this Court is unaware that the reasonableness of the fees based upon the benefit obtained should be weighed in regard to what appeared reasonable when the fees were incurred. Indeed, the 1994 Bankruptcy Reform Act changes to § 330, effective for cases filed after October 22, 1994, show Congress's intent in this regard.[14] However, this Court is also aware that such decisions have to be made by the professional at that time with information and under circumstances that neither the Court or other creditors could know or adequately explore without actually doing the professional's job. The benefit obtained is a very probative factor, however, that weighs on the propriety of the professional's choice

at that time. The Bankruptcy Code has provided for the retroactive inspection of the professional's actions through the § 331/§ 330 interim/final fee application process, and the fact that the professional bears the burden to show the reasonableness of fees requested. Thus, when a professional's efforts have failed to produce a significant benefit, the task of proving the reasonableness of the fees to the Court becomes unsurprisingly more difficult.

SZD relies heavily upon the fact that the ostensive "purchase price" under the terms of the Plan was Five Million Dollars ($5,000,000), but a closer inspection of the Third Amended Plan and Disclosure Statement reveal that the actual cash to be put into the case was substantially less, and to be paid over time. Also, even after two years of negotiations with the proposed purchaser, and while SZD had incurred all these fees on various activities, the Third Amended Plan and Disclosure Statement still contained numerous contingencies that were yet to be resolved after the purchaser performed due diligence. This Court can only find that Eight Hundred Fifty Thousand Dollars ($850,000.00) was the actual present value of the purchase offer, once all the contingencies were eliminated and future or contingent cash payments were reduced to a present cash payment. Granted, it would have taken an astute bankruptcy counsel to appreciate the true value of this business, but SZD is such a firm and it billed as such in this case. Further, even under the previous Plans and Disclosure Statements, SZD fees and expenses were in proportions that rivaled the present value of the potential distribution to unsecured creditors.[15]

---

**13.** Though the foregoing analysis quoted from *Allied* was directed mainly to adversary proceedings brought in pursuit of assets of the estate, it applies as well to a professional's duty when providing services to effectuate an lengthy and costly reorganization.

**14.** Again, the Bankruptcy Reform Act of 1994 amendments of § 330(a)(3)(C) and § 330(a)(4)(A) bear out this principle.

**15.** Under the terms of the original Disclosure Statement and Plan filed November 30, 1993, the unsecured creditors would receive One Million

Three Hundred Fifty Thousand Dollars ($1,350,000), or approximately forty-five (45%) of their claims, over three years. Thereafter, the Pension Benefit Guaranty Corporation filed a very large proof of claim, a large portion of which could have been entitled to priority status. By the Second Amended Disclosure Statement and Plan, filed May 25, 1994, the distribution to unsecured creditors was estimated at only One Million Two Hundred Seventy Thousand ($ 1,270,000), or twenty percent (20%) of their claims, over four years. About this time, the IRS filed its *huge* administrative expense excise tax claim, and the settlement negotiated with the

This Court cannot ignore the fact that all parties in this case hoped for a successful outcome that would preserve this Toledo business and the jobs that went with it, as well as providing some distribution to unsecured creditors. Nevertheless, considering the extent of effort SZD put into this case against the ultimate value of this case, this Court concludes that SZD provided the right services for the wrong case. Seven Hundred Eight Thousand Three Hundred Two and 37/100 Dollars ($708,302.37) is a large amount of fees and expenses for a case such as this, especially considering the other professional expenses which were accruing by professionals whose duties which did not so directly bear on determining the ultimate likelihood of a successful reorganization. Simply put, SZD should have exercised more billing discretion. They are redeemed in part, however, by the fact that they did file periodic fee applications that adequately detailed the services they were providing.

For all these reasons this Court concludes that it will allow interim fees and expenses already paid to SZD, but will deny SZD any further payments from the bankruptcy estate. Though this is a significant cut in SZD's fee request, this Court finds it appropriate considering the likelihood of benefit to the estate relative to the amount of compensation requested, as well as the minimal funds on hand to pay what could be a huge amount of administrative expense claims. This Court will not permit any further payment on what has proven to be a fruitless endeavor. A similar result could be achieved under the doctrine of equitable subordination found in § 510 of the Bankruptcy Code. For the elements of equitable subordination see Collier on Bankruptcy, § 510.05[1], 510–13 (15th ed. rev. Dec. 1996); citing *In the Matter of Mobile Steel Co.*, 563 F.2d 692 (5th Cir.1977) and *United States v. Noland*, 517 U.S. 535, 116 S.Ct. 1524, 134 L.Ed.2d 748 (1996).

In reaching the conclusions found herein, the Court has considered all of the evidence, exhibits and arguments of counsel, regardless of whether or not they are specifically referred to in this opinion.

Accordingly, it is

**ORDERED** that the United States Trustee's Request for Court Determination as to Manner in which Funds Should be Distributed and Interest Upon Funds Disgorged be, and is hereby, *GRANTED*.

It is **FURTHER ORDERED** that the Chapter 7 Trustee shall distribute the assets available in this case on a pro rata basis, considering only the unpaid portion of administrative expenses.

It is **FURTHER ORDERED** that Schottenstein, Zox & Dunn Co., L.P.A. shall be allowed as a final fee and expense award for services rendered and expenses incurred in the Chapter 11 those fees and expenses for which they have already received payment. The total amount of these fees and expenses is Five Hundred Four Thousand One Hundred Seventy-six and 93/100 Dollars ($504,-176.93). All unpaid fees and expenses are hereby disallowed.

---

IRS yielded a distribution to unsecured creditors in the amount of only five percent (5%), or Two Hundred Fourteen Thousand Dollars ($214,000),

per the Third Amended Disclosure Statement and Plan filed February 24, 1995.